301 P.3d 607

**STATE of Hawai'i, Respondent/Plaintiff–Appellee,**

v.

**Geoffrey WOODHALL, Petitioner/Defendant–Appellant.**

**No. SCWC–11–0000097.**

Supreme Court of Hawai'i.

May 31, 2013.

Kirsha K.M. Durante, for petitioner.

Linda L. Walton, for respondent.

NAKAYAMA, ACOBA, McKENNA, and POLLACK, JJ., with RECKTENWALD, C.J., Concurring and Dissenting Separately.

Opinion of the Court by McKENNA, J.

# I. Introduction

A medical marijuana patient was arrested for possessing medical marijuana while passing through airport security at Kona International Airport. He was later convicted of Promoting a Detrimental Drug in the Third Degree. We are called upon to determine whether (1) the defendant presented sufficient evidence to trigger a medical marijuana affirmative defense in a stipulated fact trial, in which the parties stipulated that the defendant possessed a valid medical marijuana certificate and that the marijuana he possessed was medical marijuana; and (2), if so, whether the conflict between a statute that allows medical use of marijuana, including transportation of such marijuana, and another statute that prohibits transportation of medical marijuana through any place open to the public, creates an irreconcilable conflict

1. The Honorable Joseph P. Florendo, Jr. presided.

2. Woodhall was prosecuted under state law. We note that possession of marijuana is still subject to criminal prosecution and civil penalties under the federal Controlled Substances Act, 21 U.S.C. §§ 801–971 (1999). In contrast to numerous

that must be resolved in favor of the defendant.

Based on the analysis below, we answer both questions in the affirmative. We therefore vacate the ICA's Judgment on Appeal, and remand this case to the district court to enter a judgment of acquittal, consistent with this opinion.

# II. Background

## A. The Trial[1]

Petitioner/Defendant–Appellant Geoffrey Woodhall ("Woodhall") was charged by Complaint with "knowingly possess[ing] marijuana or a Schedule V substance, that is, marijuana, in any amount, thereby committing the offense of Promoting a Detrimental Drug in the Third Degree, in violation of Section 712–1249(1), Hawai'i Revised Statutes, as amended." HRS § 712–1249(1) (1993) provides, "A person commits the offense of promoting a detrimental drug in the third degree if the person knowingly possesses any marijuana or any Schedule V substance in any amount."[2]

The charge stemmed from an incident in which marijuana in a clear plastic baggie was discovered in Woodhall's possession at the Kona International Airport. Woodhall was arrested and prosecuted despite presenting a valid Medical Marijuana Registry Patient Identification Certificate.

Woodhall apparently filed a Motion to Dismiss the charge against him, as referenced in the State's Response to Defendant's Motion to Dismiss. Based on the counter-argument raised by the State, it would appear that Woodhall argued that an ambiguity in the medical marijuana statutes required dismissal of the charge against him.

In this regard, HRS § 329–121 (2010) provides, with emphasis added:

"Medical use" means the acquisition, possession, cultivation, use, distribution, or

state medical marijuana laws, the federal government continues to list marijuana as a Schedule I controlled substance because it considers marijuana to have "no currently accepted medical use treatment in the United States." 21 U.S.C. §§ 812(b)(1); Schedule I(c)(10).

transportation of marijuana or paraphernalia relating to the administration of marijuana to alleviate the symptoms or effects of a qualifying patient's debilitating medical condition. For the purposes of "medical use[,"] the term distribution is limited to the transfer of marijuana and paraphernalia from the primary caregiver to the qualifying patient.

It also appears that Woodhall argued that HRS § 329–121's authorization of transportation as a medical use is inconsistent with HRS § 329–122 (2010)'s prohibition on the medical use of marijuana in public places, creating an ambiguity in the medical marijuana laws. HRS § 329–122 provides, with emphasis added:

(c) The authorization for the medical use of marijuana in this section shall not apply to: . . . .

(2) The medical use of marijuana:

(A) In a school bus, public bus, or any moving vehicle;

(B) In the workplace of one's employment;

(C) On any school grounds;

(D) At any public park, public beach, public recreation center, recreation or youth center; or

(E) Other place open to the public. . . .

It appears that the crux of Woodhall's argument was that the only prohibited "use" of marijuana in a public place is "smoking."

The State, on the other hand, argued that "medical use" in HRS § 329–121 includes possession, transportation, and acquisition, and that the prohibition on medical use in public places under HRS § 329–122 includes possession, transportation, and acquisition. Further, the State argued that Chapter 329, Part IX generally, and the phrase "medical use" specifically, should be strictly construed, in line with the legislature's stated purpose: "[T]he legislature does not intend to legalize marijuana for other than medical purposes. The passage of this Act and the policy underlying it does not in any way diminish the legislature's strong public policy and laws against illegal drug use." *See* 2000 Haw. Sess. Laws Act 228, § 1 at 596. The Motion to Dismiss appears to have been denied, as the parties proceeded to a bench trial.

In a later filing, a Memorandum of Law Regarding [sic] in Support of Stipulated Facts for Bench Trial ("Memorandum"), Woodhall argued he was authorized to possess marijuana for medical use as a qualifying patient. He argued that "medical use" includes transportation; therefore, he should be acquitted of the charge because he had a medical use of marijuana affirmative defense. Second, Woodhall argued that "H.R.S. §§ 329–121 and 329–122, when read in concert are ambiguous and therefore, mak[e] it impossible for defendant to formulate the required knowing state of mind." He argued the following:

[T]ransportation for medical use is specifically allowed, however, a person [cannot] transport medical marijuana in any "place open to the public." A plain meaning reading of these two statutory provisions leads to an absurd result because it seemingly requires a qualifying patient's marijuana to somehow magically appear wherever he may be so that it may be used.

He argued that strict compliance with these ambiguous statutes produced an absurd result:

[A] qualifying patient would seemingly always be in violation of H.R.S. § 329–122(c)(2)(E) when transporting their marijuana unless they were walking/transporting in their own home, on private property, etc. How the qualifying patient would be able to get their medical marijuana to their own home or to private property seems a near impossibility since they would arguably have to walk somewhere open to the public, such as a sidewalk, to get to their home or private property.

Woodhall further argued that the "legislative history does not indicate a specific or general intent to prohibit the medical use of marijuana in all places open to the public," and that there is no specific legislative history explaining how HRS § 329–122(c)(2)(E)'s "open to the public" prohibition came about.

Thus, before trial, the fact that the marijuana was medical marijuana was accepted by both parties, with the only issue in dispute being a legal one: whether Woodhall could have possessed and transported the marijua-

na through Kona International Airport, a place open to the public.

Therefore, the parties agreed to a bench trial on stipulated facts. Their agreement and the stipulated facts follow:

Defendant GEOFFREY WOODHALL ("DEFENDANT"), by and through and on the advice of counsel SHERI S. LAWSON, Deputy Public Defender, having waived his right to trial, and the STATE OF HAWAI'I, by and through JEFFREY BURLESON, Deputy Prosecuting Attorney, having agreed with the Defendant to a trial before the Court on stipulated facts, do now submit those facts which they agree upon and hereby stipulate to as follows:

1. On the [sic] March 8, 2010 in Kona, County and State of Hawaii Geoffrey Woodhall knowingly possessed marijuana measuring 2.12 grams at the Kona International Airport. The marijuana was contained in a clear plastic baggie.

2. The Kona International Airport is a place open to the public.

3. The marijuana in Defendant's possession is marijuana as defined pursuant to Hawaii Revised Statutes ("HRS") 329–1 and 712–1240.

4. Defendant possessed a valid medical marijuana certificate, Registration No. MJ14476, on March 8, 2010. *See* Exhibit "A".[3]

5. Defendant possessed the medical marijuana to transport it through airport security at the Transportation Security Administration ("TSA") checkpoint. TSA employees discovered the medical marijuana in his possession. Defendant provided his valid medical marijuana certificate to TSA officials as well as Hawaii County Police Department officer David T. Matsushima.

6. Defendant was not smoking, inhaling, or ingesting the medical marijuana.

7. The Defendant has been informed that he has the right to have a trial. The Defendant has also been informed that at trial he has the right to confront and cross[-]examine the witnesses who testify. The Defendant hereby waives his right to a trial in this matter and agrees to have the question of his guilt or innocence determined by the Court alone based upon the above facts, exhibits and subsequent submissions of counsel. The Defendant also waives his right to cross[-]examine the witnesses and agrees to submit the above facts, attached exhibits, and submissions of counsel without cross-examination.[4]

The stipulation called upon the trial court to determine the legal effect (*i.e.*, whether medical marijuana can be transported in a place open to the public) of the two facts agreed to by the parties: (1) that Woodhall's marijuana was medical marijuana (Stipulated Facts 4, 5, and 6); and (2) that the Kona International Airport was a place "open to the public." (Stipulated Fact 2). The district court continued the matter for further argument and judgment.

At the continued hearing, the district court heard closing arguments. The State did not argue or present any evidence that the marijuana Woodhall possessed and transported did not qualify as medical marijuana. The State argued only that the prohibition on transport in public places should be strictly construed:

[W]e believe that the statute on medical marijuana regarding the permitted use of—medical marijuana is very clear. The statutes particularly define what the definition of medical use is. It includes things like possession, acquisition, distribution, and transportation, and the statutes clearly state that those activities are prohibited in places that are open to the public like an airport in this case. And I don't think there's any dispute that the Kona International Airport in this case is a place open to the public. It's a stipulated fact. And we believe the statute is restrictive, but we believe that it was done purposely and deliberately by the legislature.

---

3. A copy of Woodhall's Medical Marijuana Registry Patient Identification Certificate was included with the stipulation.

4. The district court also twice colloquied Woodhall regarding whether his agreement to enter the Stipulated Facts for trial was knowing and voluntary.

Similarly, in closing arguments, the defense focused on whether transport could be prohibited at the Kona International Airport, a place open to the public, in light of the ambiguity in the interrelationship between HRS §§ 329–121 and –122. Defense counsel argued the statutes were ambiguous, "because you cannot allow for transportation under the definition of medical use but yet have no ability to transport [medical marijuana] anywhere open to the public."

In ruling, however, the court stated that the phrase "relating to the administration of marijuana to alleviate the symptoms or effects of the patient's debilitating medical condition," found in HRS § 329–121's definition of "medical use" qualified "transportation." The court also opined that the term "distribution" in the phrase "medical use" was further "limited to the transfer of marijuana and paraphernalia from the primary caregiver to the qualifying patient." HRS § 329–121.

Defense counsel seemed taken aback by the district court's qualification. Defense counsel argued that the purpose of Woodhall's medical marijuana was to alleviate the symptoms or effects of the patient's debilitating medical condition, as evidenced by his valid medical marijuana license. Defense counsel also argued that Woodhall was traveling for personal purposes with the medical marijuana to treat his condition. Defense counsel then asked the district court if it would like Woodhall to testify. The district court then stated, "I don't know. You submitted me these facts, stipulated facts.... And I'm going to rule based upon these stipulated facts."

The district court then concluded that the facts of the case did not show that Woodhall transported the marijuana to alleviate the symptoms or effects of a debilitating medical condition (or that the transport involved a transfer of marijuana from a primary caregiver to Woodhall). Accordingly, the district court adjudged Woodhall guilty, imposed a $50 fine, $30 criminal injury fee, and $250 drug reduction assessment fee. The execution of sentence was stayed pending appeal.

The district court did allow Woodhall to make a statement. The following exchange occurred:

MR. WOODHALL: Well, I would like to ask how, if someone's diagnosed with this problem and given a license by a doctor and the state, how do they ever obtain any medicine to begin with if they can never have it brought to them or they can never acquire it?

THE COURT: Maybe you didn't understand or hear what I was saying. Okay? Where do you get your marijuana from?

MR. WOODHALL: Actually, I grow it.

THE COURT: You grow it. Okay. So you're not—you don't need to transport it from one place to the other. You have it at home. I think the statute allows transportation if you have to get it from someone else and bring it to your home. That's what I think is a reasonable interpretation of the statute. Otherwise, it would be somewhat beyond the control of the police if everyone were allowed to transport it wherever they wanted, whenever they wanted and—

MR. WOODHALL: Right. But the day you leave your doctor's office and you have your recommendation and you receive your license, how do you actually get the marijuana to begin with?

THE COURT: I don't know. How do other people get it? You know, some people have what they call caregivers. I've heard of people growing marijuana under permit for other people. I don't think the State of Hawaii has pharmacies that hand out prescribed marijuana, but I think that the statute, in order for it to be a reasonable interpretation, would mean that from your primary caregiver, you could go there, get your marijuana, and then take it home and transport it home, and that would be okay.

MR. WOODHALL: What if you don't have a caregiver?

THE COURT: You said you grow it at home. You don't have to transport it anywhere. It's there.

MR. WOODHALL: But at some point during the process of me acquiring marijuana, I must have broken the law then.

So the basis of the law would be how do you get it? Unless the stork flies over your house and drops it on your land, how would you acquire it legally?

THE COURT: Pardon me?

MR. WOODHALL: I mean you could never go somewhere to get it from someone to start the whole process if you're breaking the law just by doing that.

THE COURT: Okay. Well, I guess I can't explain myself to you, and I'm sorry about that.

## B. The ICA Appeal

■ Woodhall timely appealed.[5] The ICA affirmed the district court's Notice of Entry of Judgment and/or Order. Woodhall, SDO at 7. The ICA held, "Woodhall failed to carry his burden of proving, by a preponderance of the evidence, his affirmative defense of medical use as defined in HRS § 329–121." *Id.* at 4. Specifically, the ICA stated that the stipulated facts "do not specify that Woodhall was transporting marijuana to alleviate symptoms or the effects of a debilitating medical condition." *Id.* It further held, "The written

certification does not create a presumption as to Woodhall's purpose for possessing marijuana at the Kona Airport." *Id.* For those reasons, the ICA concluded that the district court did not clearly err in its January 20, 2011 oral findings of fact. *Id.* at 4–5. Woodhall challenges only this part of the ICA's SDO on certiorari.

## III. Discussion

### A. Statutory Interpretation

■ In interpreting a statute, we adhere to certain well established principles: First, the fundamental starting point for statutory interpretation is the language of the statute itself. Second, where the statutory language is plain and unambiguous, our sole duty is to give effect to its plain and obvious meaning. Third, implicit in the task of statutory construction is our foremost obligation to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. Fourth, when there is doubt, doubleness of meaning, or indistinctiveness or uncertain-

---

5. While Woodhall's appeal was before the ICA, the district court filed its Findings of Fact, Conclusions of Law, and Judgment ("FOFs/COLs"). The ICA concluded that the district court lacked jurisdiction to enter its FOFs/COLs once Woodhall filed his Notice of Appeal. *State v. Woodhall*, CAAP–11–0000097, 2012 WL 4369258 (App. Sept. 25, 2012)(SDO), at 5–6. The ICA, therefore, did not address Woodhall's challenge to the district court's Conclusion of Law Number 5, which stated that as a matter of law, medical marijuana cannot be transported in any place open to the public. *Id.* at 2–6.

At oral argument, the State argued that the district court did have jurisdiction to enter its FOFs/COLs under Rules of the District Court ("RDCH") Rule 21 (2011). http://www.courts.state.hi.us/courts/oral_arguments/archive/oasc_11_97.html. That rule provides, in relevant part, "The party who prevails after the presentation of evidence shall upon request submit to the court proposed findings of fact and conclusions of law pursuant to Rule 52, District Court Rules of Civil Procedure." District Court Rules of Civil Procedure ("DCRCP") Rule 52(c)(2011) in turn provides, in relevant part, "Notwithstanding the filing of the notice of appeal, the court shall retain jurisdiction to make and file such findings and conclusions and to amend the judgment to conform thereto, if necessary."

These rules do not apply to the instant criminal proceeding. *See* DCRCP Rule 1 (2011)("These

rules govern the procedure in the district courts of the State in all suits of a civil nature....") The Hawai'i Rules of Penal Procedure ("HRPP") "govern the procedure in the courts of the State in all penal proceedings...." HRPP Rule 1 (2011). HRPP Rule 23(c) (2011) states:

In a [bench trial] the court shall make a general finding and shall in addition, on request made at the time of the general finding, find such facts specially as are requested by the parties. Such special findings may be ... in writing at any time prior to sentence.

In this case, sentencing occurred on January 20, 2011. Although the FOFs/COLs were dated nunc pro tunc to January 20, 2011, they were filed on March 17, 2011, nearly two months after sentencing. Therefore, the district lacked jurisdiction to enter its FOFs/COLs.

In any event, the district court's Findings of Fact largely restated the stipulated facts. Its Conclusions of Law set forth the applicable statutes and culminated in Conclusion of Law Number 5, which stated, "The Court finds, as a matter of law, [that] HRS § 712–1249(1) prohibits any person from possessing any amount of marijuana, and that HRS § 329–122 does not permit the medical use of marijuana in any place open to the public." We interpret the applicable statutes as a question of law in any event, regardless of whether the district court's Conclusions of Law were properly filed.

ty of an expression used in a statute, an ambiguity exists. And fifth, in construing an ambiguous statute, the meaning of the ambiguous words may be sought by examining the context, with which the ambiguous words, phrases, and sentences may be compared, in order to ascertain their true meaning.

*State v. Silver*, 125 Hawai'i 1, 4, 249 P.3d 1141, 1144 (2011) (citations omitted). "In construing an ambiguous statute, this court may consider '[t]he reason and spirit of the law, and the cause which induced the legislature to enact it ... to discover its true meaning.'" 125 Hawai'i at 4–5, 249 P.3d at 1144–45 (citation omitted).

### B. Question Presented

Woodhall's sole question presented is:

> The ICA gravely erred in holding that in a prosecution under HRS § 712–1249, promoting a detrimental drug in the third degree, Woodhall's valid medical marijuana certification was insufficient evidence to prove by a preponderance of the evidence that Woodhall possessed the marijuana for medical purposes pursuant to HRS §§ 329–122 and 712–1240.1, medical use of marijuana and defense to promoting, respectively.

### C. Woodhall's Argument

In support of his argument, Woodhall states the following:

> The stipulation to the valid medical marijuana certificate subsumes that Woodhall fulfilled the requirements under HRS § 329–122(a)(1) and (a)(2). Specifically, the State agreed that Woodhall had been diagnosed by a physician as having a debilitating medical condition and that his physician certified that the medical use of marijuana would likely outweigh the health risks in treating Woodhall's condition. The stipulated facts did *not* indicate that Woodhall possessed the marijuana for any purpose other than for medicinal use.

As such, Woodhall argues that it is not necessary for him to "recite that he was in possession of or transporting the marijuana 'to alleviate the symptoms or the effects of a debilitating medical condition,'" in order to avail himself of the affirmative defense. Further, Woodhall argues that the ICA's "limited interpretation of the medical marijuana statute is contrary to the purpose of the law as illuminated by the legislative history." Specifically, Woodhall points to Section 1 of Act 228, which states that the purpose of Chapter 329, Part IX was "to ensure that *seriously ill people* are not penalized by the State for the use of marijuana for strictly medical purposes when the patient's treating physician provides a professional opinion that benefits of medical use of marijuana would likely outweigh the health risks for the qualifying patient." 2000 Haw. Sess. Laws Act 228, § 1 at 596. Woodhall argues that his failure to "utter that he ... was transporting the marijuana 'to alleviate symptoms or effects of the qualifying patient's debilitating medical condition'" should not nullify the medical use defense, which would be an absurd reading of the medical marijuana statutes that the legislature could not have intended.

Woodhall also argues that if this court finds that it was necessary for him to have qualified his transportation of marijuana as necessary "to alleviate symptoms or effects of the qualifying patient's debilitating medical condition," then he asks that the rule of lenity be exercised in his favor, "given the lack of clarity in the statute of this requirement." Lastly, Woodhall argues that the State presented no evidence that Woodhall was transporting the marijuana for any purpose other than medical use. In fact, the State stipulated that Woodhall possessed and was in the process of transporting "medical marijuana" with a valid medical marijuana certificate. In light of these stipulated facts, Woodhall argues that "the ICA gravely erred in holding that Woodhall failed to carry his burden" of proving the medical use affirmative defense.

### D. Analysis
#### 1. The Medical Marijuana Affirmative Defense

Woodhall's arguments are persuasive. Medical use of marijuana pursuant to Chapter 329, Part IX is an affirmative defense to HRS § 712–1249, promoting a detrimental

drug in the third degree. "A defense is an affirmative defense if ... [i]t is specifically so designated by the Code or another statute." HRS § 701–115(3) (1993).

The part of the code specifically designating medical use of marijuana as an affirmative defense is HRS § 712–1240.1(2) (1993 & Supp.2000), which provides, "It is an affirmative defense to prosecution for any marijuana-related offense defined in this part that the person who possessed or distributed the marijuana was authorized to possess or distribute the marijuana for medical purposes pursuant to part IX of chapter 329." Another statute also specifically designates medical use of marijuana as an affirmative defense. HRS § 329–125(a) (2010) provides, in relevant part, "A qualifying patient ... may assert the medical use of marijuana as an affirmative defense to any prosecution involving marijuana under this [part] or chapter 712; provided that the qualifying patient ... strictly complied with the requirements of this part."

"If the defense is an affirmative defense, the defendant is entitled to an acquittal if the trier of fact finds that the evidence, when considered in light of any contrary prosecution evidence, proves by a preponderance of the evidence the specified fact or facts which negative penal liability." HRS § 701–115(2)(b) (1993). In this case, the only evidence presented was Woodhall's Medical Marijuana Registry Patient Identification Certificate and the stipulated facts.

■ "[I]n any criminal case, the burden of proof falls on the prosecution to prove each element of the crime for which the defendant is charged. It is only after the prosecution meets this burden that any offered affirmative defense becomes relevant." *State v. Pratt*, 127 Hawai'i 206, 212, 277 P.3d 300, 306 (2012). In this case, Woodhall and the State stipulated to all of the elements of the offense of Promoting a Detrimental Drug in the Third Degree, in violation of HRS § 712–1249. The elements of that offense are that a person (1) knowingly (2) possesses any marijuana in any amount. Stipulated Fact 1 states, "Woodhall knowingly possessed marijuana measuring 2.12 grams." Thus, the

prosecution met its burden and triggered the assertion of Woodhall's affirmative defense.

■ In determining whether a defendant has proven his affirmative defense by a preponderance of the evidence, this court has stated, "The preponderance of the evidence standard directs the factfinder to decide whether 'the existence of the contested fact is more probable than its nonexistence.'" *State v. Romano*, 114 Hawai'i 1, 8, 155 P.3d 1102, 1109 (2007) (citations omitted). "Accordingly, '[t]o prevail, [the defendant] need only offer evidence sufficient to tip the scale slightly in his or her favor, and [the prosecution] can succeed by merely keeping the scale evenly balanced." *Id.* (citation omitted).

■ In this case, however, the district court preempted any consideration of Woodhall's affirmative defense by questioning facts in the stipulation. The parties stipulated to the following facts: (1) that Woodhall was transporting medical marijuana; and (2) that the transport occurred at the Kona International Airport, a place open to the public. In criminal cases, "stipulations are ordinarily binding...." *State v. Murray*, 116 Hawai'i 3, 13, 169 P.3d 955, 965 (2007). The facts within a stipulation are taken to be "conclusive ... [and] binding upon the parties, the trial judge and [the appellate] court." *See Hogan v. Watkins*, 39 Haw. 584, 586 (Haw.Terr.1952). Stipulations are particularly useful where the parties wish to narrow the issues for trial.

The parties in this case stipulated to the essential elements of the offense of promoting a detrimental drug in the third degree so that they could put the affirmative defense squarely at issue. They then stipulated that Woodhall's marijuana was medical marijuana (presumably to meet the definition of "medical use" under HRS § 329–121), and that Kona International Airport was a place open to the public (presumably to fit the prohibition under HRS § 329–122(c)(E)), in order to further narrow the issue at trial to the legal effect of those facts: should HRS §§ 329–121 and –122 be strictly construed in favor of the State, or should strict construction of these statutes be set aside as ambiguous and pro-

ducing an absurd result the legislature could not have intended?

■■■ The district court did not give full effect to the stipulation, however, and re-opened for factual determination Woodhall's "medical use" of marijuana under HRS § 329–121. The stipulated facts show, however, that the parties intended to be a conclusive and binding fact that the marijuana was for "medical use." First, the parties stipulated that Woodhall "possessed a valid medical marijuana certificate." This fact indicates, inter alia, that the "qualifying patient has been diagnosed by a physician as having a debilitating medical condition," and that the "qualifying patient's physician has certified in writing that, in the physician's professional opinion, the potential benefits of the medical use of marijuana would likely outweigh the health risks for the particular qualifying patient." HRS §§ 329–122(a)(1) and (2).

Second, the stipulation characterizes the marijuana as "medical marijuana" numerous times, further indicating the parties' intent to satisfy the "medical use" definition. Lastly, the amount of marijuana in Woodhall's possession was 2.12 grams, or 0.074781 ounces. 2.12 grams is within the three-ounce limit designated by HRS § 329–121 as an "adequate supply," or "not more than is reasonably necessary to assure the uninterrupted availability of marijuana for the purpose of alleviating the symptoms or effects of a qualifying patient's debilitating medical condition. . . ." Any amount over three ounces could be considered not for medical purposes. Therefore, none of the stipulated facts suggested that Woodhall possessed the medical marijuana for any purpose other than a "medical use."

As such, Woodhall proved he "was authorized to possess . . . the marijuana for medical purposes pursuant to part IX of chapter 329," as HRS § 712–1240.1(2) requires. There was no contrary prosecution evidence indicating that the marijuana was not for medical use. Therefore, the district court erred in so finding. The district court heard no further testimony; the credibility of witnesses was not at issue. Under HRS § 701–115(2)(b), then, Woodhall was "entitled to an acquittal if the trier of fact finds that the evidence, when considered in light of any contrary prosecution evidence, proves by a preponderance of the evidence the specified fact or facts which negative penal liability." HRS § 701–115(2)(b).

## 2. Transportation of Medical Marijuana

Having shown that the marijuana he possessed was for "medical purposes pursuant to part IX of Chapter 329," Woodhall still had the burden of proving the rest of his affirmative defense, by a preponderance of the evidence, under HRS § 329–125, which requires that "the qualifying patient . . . strictly complied with the requirements of [Chapter 329, Part IX]." In other words, Woodhall still had the burden of proving that his "medical use," which includes "transportation" under HRS § 329–121 could nevertheless take place at the Kona International Airport, a place "open to the public," in which, pursuant to HRS § 329–122(c), "[t]he authorization of medical use of marijuana . . . shall not apply. . . ." In light of the tension between HRS §§ 329–121 and –122, it is not clear what "strict compliance" with Chapter 329, Part IX fairly means.

■■■ Before the ICA, the State argued that Chapter 329, Part IX should be "restrictively" construed to effect the legislature's "strong public policy and laws against illegal drug use." However, "[e]ven the rule that penal statutes are to be strictly construed does not permit a court to ignore the legislative intent, nor does it require the rejection of that sense of the words used which best harmonizes with the design of the statute or the end in view." *State v. Murray*, 63 Haw. 12, 621 P.2d 334 (1980)(citing *State v. Prevo*, 44 Haw. 665, 669, 361 P.2d 1044, 1047 (1961)); *see also* HRS § 701–104 (1993) ("[I]n order to promote justice and effect the objects of the law, all of [the Hawai'i Penal Code] provisions shall be given a genuine construction, according to the fair import of the words, taken in their usual sense, in connection with the context, and with reference to the purpose of the provision.").

In creating Chapter 329, Part IX by Act 288 of the 2000 Legislative Session, the legislature's "end in view" or "purpose of the

provision" was to protect medical marijuana users from prosecution:

> [T]he purpose of this Act is to ensure that seriously ill people are not penalized by the State for the use of marijuana for strictly medical purposes when the patient's treating physician provides a professional opinion that the benefits of medical use of marijuana would likely outweigh the health risks for the qualifying patient.

2000 Haw. Sess. Laws Act 228, § 1 at 596. This purpose seems to envision protection from prosecution for medical users like Woodhall, who have valid Medical Marijuana Registry Patient Identification Certificates.

Chapter 329, Part IX, as enacted, does not clearly carry out its purpose, leaving qualified patients vulnerable to prosecution. It is especially unclear how medical marijuana is transported to the homes of qualified patients in the first instance, or by qualified patients anywhere outside their homes. First, Chapter 329, Part IX envisions only home cultivation as the manner in which a qualifying patient obtains medical marijuana. HRS § 329–121's definition of "adequate supply" demonstrates that medical marijuana comes only from plants cultivated in the home:

> "Adequate supply" means an amount of marijuana jointly possessed between the qualifying patient and the primary caregiver that is not more than is reasonably necessary to assure the uninterrupted availability of marijuana for the purpose of alleviating the symptoms or effects of a qualifying patient's debilitating medical condition; provided that an "adequate supply" shall not exceed three mature marijuana plants, four immature marijuana plants, and one ounce of usable marijuana per each mature plant.

Second, Chapter 329, Part IX makes no provision for how medical marijuana would even arrive at the qualifying patient's home. Although HRS § 329–121 defines "medical use" to include "transportation," and although HRS § 329–121 defines "distribution" to mean the "transfer of marijuana and paraphernalia from the primary caregiver to the qualifying patient," HRS § 329–122(c)(E) prohibits "medical use" (to include "transportation" and "distribution") in "place[s] open to the public." Presumably, medical marijuana could not be transported or distributed on sidewalks, *see* Hawai'i County Code § 22–3.8(2002)(requiring that permitted uses on sidewalk "not impede or endanger the public's use"), and on "[a]ll roads, alleys, streets, ways, lanes, bikeways, bridges, and all other real property highway related interests in the State, opened, laid out, subdivided, consolidated, and acquired and built by the government," as HRS § 264–1 (2007 & Supp. 2008) declares these to be "public highways," *i.e.,* places open to the public. In other words, a qualifying patient's medical marijuana cultivation and consumption can only happen at home, yet there is no mechanism by statute by which the qualifying patient could ever legally bring the medical marijuana to his or her home.

Third, assuming the medical marijuana arrives at a qualifying patient's home, Chapter 329, Part IX makes no provision for its possession outside the home, even though qualifying patients, like other ordinary people, may be absent from the home for many hours at a time; travel for extended periods of time; move residences; reside in more than one residence; evacuate their homes during emergencies like tsunami warnings, floods, and fires; and become homeless. Chapter 329, Part IX unrealistically envisions a qualifying patient to be permanently homebound.[6] This is the situation the district

6. The Concurrence/Dissent acknowledges that "the legislature['s failure] to adequately provide a mechanism by which a qualifying patient could receive their initial supply of marijuana is an absurdity that this court can address, since failing to do so would completely frustrate the legislature's purpose in enacting the statute." Concurrence/Dissent at 622. The Concurrence/Dissent also asserts, however, that "there is no absurdity in construing [HRS § 329–122(c)(2)(E)] as prohibiting transportation for other purposes," the "other purposes" being any transportation other than the "transportation through public places for the purpose of obtaining an initial supply of medical marijuana...." Concurrence/Dissent at 621, 622. However, the definition of "medical use" in HRS § 329–121 includes "transportation" in general, and it would be absurd to limit the medical use of marijuana to one's home only, which would in effect require a medical marijuana patient to be

court seemed to accept when he told Woodhall, "You grow it. Okay. So you're not—you don't need to transport it from one place to the other. You have it at home."

The confusion within Chapter 329, Part IX is apparent, such that the meaning of HRS § 329-125's requirement of "strict compliance" is uncertain. An examination of the legislative history of Act 228 of the 2000 Legislative Session, which was later codified as Chapter 329, Part IX, provides little guidance. The legislative history reveals that home cultivation, transport, and public medical use of marijuana were debated, but without resulting clarification of those provisions. First, multiple legislators had misgivings about home cultivation as the sole means by which qualifying patients obtain medical marijuana. Representative Whalen stated:

> Distribution is one thing, growing [marijuana] on your property is something else. [The bill] limits distribution. It doesn't limit the cultivation of it. To get to the main point here, if we really wanted to treat [marijuana] as a drug we would treat it just as we treat cocaine, heroine [sic], morphine, the opiate families, we would treat it as such and allow doctors to prescribe it. But what we are doing is we are allowing people to grow their own and smoke it if they can get their doctor to sign a piece of paper.

2000 House Journal, at 580 (Statement of Rep. Whalen). Senator Anderson also had concerns about home cultivation. He stated he would rather "designate a grower from each island ... designated as people you could buy from," as that was the trend on the mainland. 2000 Senate Journal, at 282 (Statement of Sen. Anderson). *See also* 2000 Senate Journal, at 283 (Statement of Sen. Anderson)("[T]he way the bill is written, anybody and his brother could grow marijuana wherever they wanted to.... That's why I said we should designate an area and allow

someone to be able to enforce this bill that we have."); 2000 Senate Journal, at 556 (Statement of Sen. Anderson). Senator Matsuura similarly opposed "only one part of this bill and that is on the cultivation." 2000 Senate Journal, at 284 (Statement of Sen. Matsuura).

Two other senators challenged how, if home cultivation were the only method of medical marijuana production, acquisition and transport could even occur. Senator Sakamoto had "questions [about] planting, cultivation, distribution and how one acquires marijuana since it's illegal to grow." 2000 Senate Journal, at 282–83 (Statement of Sen. Sakamoto). Senator Inouye echoed Senator Sakamoto's questions about how patients were to receive marijuana plants, stating, "Where are the plants to come from? Perhaps using the airlines to send the plants over from the Big Island or Kauai or wherever. That's a great concern." 2000 Senate Journal, at 559 (Statement of Sen. Inouye). This is the same concern raised by Woodhall in his exchange with the district court:

> MR. WOODHALL: But at some point during the process of me acquiring marijuana, I must have broken the law then. So the basis of the law would be how do you get it? Unless the stork flies over your house and drops it on your land, how would you acquire it legally?.... I mean you could never go somewhere to get it from someone to start the whole process if you're breaking the law just by doing that.

As for the prohibition on medical use in public places, only two legislators weighed in. Representative Lee's comment was less relevant to the instant appeal. She stated, "[T]his bill has inadvertently left out access to marijuana for the sickest and most needy terminal patients. Many terminally ill patients spend their last days in hospice or receiving hospital care. Marijuana would not be allowed in public places such as these."

---

completely homebound, given the many legitimate reasons a seriously ill person might need his or her medication outside the home. In so observing, we do not, as the Concurrence/Dissent asserts, "engage[ ] in policy judgments reserved for the legislature." Concurrence/Dissent at 622. We simply note that the same statutory inconsistency between HRS §§ 329–121 and –

122, which would prohibit the initial transport of medical marijuana to the home, exists with respect to subsequent acts of transport of medical marijuana from the home. There appears no rational basis to distinguish between transport to versus transport from the qualifying patient's home.

2000 House Journal, at 581 (Statement of Rep. Lee). Senator Chun Oakland, however, made a point directly relevant to this appeal. She stated her understanding was "[a]ny diversion [from the cannabis laws then in place] would be punished and smoking outside of one's home would not be permitted." 2000 Senate Journal, at 553 (Statement of Sen. Chun Oakland) (emphasis added).

This legislative history reveals that even as Act 228 became law, many of the details were left to future legislative action but remained unclear over a decade later.[7]

■■■■ The lack of clarity in the statute is apparent when we consider what kinds of transport would be permissible under Chapter 329, Part IX if transport cannot occur in any place open to the public. At oral argument, the State argued that Chapter 329, Part IX would permit a qualified patient to transport medical marijuana on foot (*i.e.*, not utilizing any moving vehicle like an automobile, airplane, ship, etc.), within the confines of one's private residence, on private roads, or through the backyards of one's neighbors (*i.e.*, not in any place open to the public). http://www.courts.state.hi.us/courts/oral_arguments/archive/oasc_11_97.html This reading of HRS § 329–125's strict compliance requirement results in an impracticability that the legislature could not have intended. "[A] departure from a literal construction of a statute is justified when such construction would produce an absurd result and . . . is clearly inconsistent with the purposes and policies of the act. . . ." *Morgan v. Planning Dep't*, 104 Hawai'i 173, 185, 86 P.3d 982, 994 (2004) (citation omitted). Accordingly, we conclude only that, under the circumstances of this case, where the defendant has proved by a preponderance of the evidence that:

(1) he was in possession of medical marijuana;

(2) the weight of the substance did not exceed an "adequate supply" under the law;

(3) he was in possession of a valid medical marijuana certificate;

(4) the marijuana was not being used, ingested or carried in open view at the time it was discovered;

(5) the marijuana was found in an "other place open to the public," where transportation for medical use might legitimately occur; and

(6) no evidence was adduced that the marijuana was transported for anything but a medical use;

the rule of lenity applies. *See State v. Bayly*, 118 Hawai'i 1, 15, 185 P.3d 186, 200 (2008) ("[W]here a criminal statute is ambiguous, it is to be interpreted according to the rule of lenity. Under the rule of lenity, the statute must be strictly construed against the government and in favor of the accused.") (citations omitted). We do not address whether other circumstances may similarly invoke the rule of lenity.[8]

**V. Conclusion**

We hold that the district court erred in redetermining the fact of medical use in contrast to the parties' stipulation, thus preempting consideration of Woodhall's affirmative defense. The parties stipulated to the fact that Woodhall possessed and transported "medical marijuana" under a valid Medical Marijuana Registry Patient Identification Certificate. The State presented no contrary evidence showing that the marijuana was for any use other than a medical use. Thus, Woodhall proved that he was authorized to possess the marijuana "for medical purposes pursuant to part IX of Chapter 329[,]" for purposes of the affirmative defense under HRS § 712–1240.1(2).

---

7. None of the subsequent amendments to Chapter 329, Part IX impacted the "medical use" definition in HRS § 329–121 or the "public places" limitation in HRS § 329–122. 2001 Haw. Sess. Laws. Act 55, § 15 at 91 (making punctuation changes to HRS § 329–122); 2009 Haw. Sess. Laws. Act 11, § 43 at 26 (clarifying definition of "physician" in HRS § 329–121); 2009 Haw. Sess. Laws. Act 169, § 7 at 674 (same); 2010 Haw. Sess. Laws, Act 57, § 4 at 81 (same); 2011 Haw. Sess. Laws, Act 73, § 6 at 193 (amending HRS § 329–123).

8. We specifically do not address whether the rule of lenity would be triggered if "transportation" were to occur through other locations or modes of transport listed in HRS § 329–122(c)(2)(A)–(E).

We further hold that the rule of lenity requires us, under the specific facts of this case, to construe HRS §§ 329–121, –122, and –125 against the government, as there is an irreconcilable inconsistency between the authorized transportation of medical marijuana under HRS § 329–121, and the prohibition on transport of medical marijuana through "any ... place open to the public" under HRS § 329–122(c)(E).

Therefore, under HRS § 701–115(2)(b), Woodhall was entitled to an acquittal because his "evidence, when considered in light of any contrary prosecution evidence, prove[d] by a preponderance of the evidence the specified fact or facts which negative[d] penal liability." Accordingly, the ICA's Judgment on Appeal is vacated, and this case is remanded to the district court with instructions to enter a judgment of acquittal, consistent with this opinion.

Opinion by RECKTENWALD, C.J., Concurring in Part and Dissenting in Part.

I agree with the majority's conclusion that it would be absurd to construe Hawaii's Medical Use of Marijuana law to prohibit all transportation of medical marijuana in public places, because doing so would provide no mechanism for a qualifying patient to obtain medical marijuana or transport it to his or her home.[1] Majority opinion at 617–19. However, I respectfully dissent from the majority's conclusion that the law also must be read to allow medical marijuana users to travel with or transport that supply of marijuana outside the home once it has been obtained. Majority opinion at 617–19. In this case, Geoffrey Woodhall presented no evidence that he was transporting an initial supply of medical marijuana to his home. Accordingly, I would affirm the judgment of the Intermediate Court of Appeals, which affirmed the District Court of the Third Circuit's January 20, 2011 Notice of Entry of Judgment and/or Order convicting Woodhall of the offense of Promoting a Detrimental Drug in the Third Degree.

"[T]he fundamental starting point for statutory interpretation is the language of the statute itself." *First Ins. Co. of Haw. v. A & B Props.*, 126 Hawai'i 406, 414, 271 P.3d 1165, 1173 (2012). Hawai'i Revised Statutes (HRS) § 329–122(a) (2010), provides the circumstances under which a qualifying patient is permitted to use medical marijuana:

(a) Notwithstanding any law to the contrary, the medical use of marijuana by a qualifying patient shall be permitted only if:

(1) The qualifying patient has been diagnosed by a physician as having a debilitating medical condition;

(2) The qualifying patient's physician has certified in writing that, in the physician's professional opinion, the potential benefits of the medical use of marijuana would likely outweigh the health risks for the particular qualifying patient; and

(3) The amount of marijuana does not exceed an adequate supply.

(Emphasis added).

"[M]edical use" of marijuana is statutorily defined as:

[T]he acquisition, possession, cultivation, use, distribution, or transportation of marijuana or paraphernalia relating to the administration of marijuana to alleviate the symptoms or effects of a qualifying patient's debilitating medical condition. For the purposes of "medical use", the term distribution is limited to the transfer of marijuana and paraphernalia from the primary caregiver to the qualifying patient.

HRS § 329–121 (2010).

Thus, pursuant to HRS § 329–121 and HRS § 329–122(a), a qualifying patient can acquire, possess, cultivate, use, distribute, or transport an "adequate supply" of marijuana if the qualifying patient is diagnosed as having a debilitating medical condition and has a physician's certification. The law envisions that a qualifying patient's "adequate supply" of medical marijuana would come from plants

---

1. I also concur in the majority's conclusion that the "medical use" element of Woodhall's affirmative defense was met in this case. Majority opinion at 616. Specifically, the stipulation re-

peatedly characterized the marijuana that Woodhall possessed as "medical marijuana." Viewed in context, this reflects the parties' agreement that the marijuana was for "medical use."

cultivated in the home. *See* HRS § 329–121 (defining "adequate supply" as "an amount of marijuana jointly possessed between the qualifying patient and the primary caregiver that is not more than is reasonably necessary to assure the <u>uninterrupted availability of marijuana for the purpose of alleviating the symptoms or effects of a qualifying patient's debilitating medical condition;</u> provided that an 'adequate supply' shall not exceed <u>three mature marijuana plants, four immature marijuana plants,</u> and one ounce of usable marijuana per each mature plant." (emphasis added)).

However, HRS § 329–122(c)(2) limits the locations in which "medical use" of marijuana can occur:

> (c) The authorization for the medical use of marijuana in this section shall not apply to:
>
> . . . .
>
> (2) The medical use of marijuana:
>
> > (A) In a school bus, public bus, or any moving vehicle;
> >
> > (B) In the workplace of one's employment;
> >
> > (C) On any school grounds;
> >
> > (D) At any public park, public beach, public recreation center, recreation or youth center; or
> >
> > (E) Other place open to the public[.]

Thus, HRS §§ 329–121 and –122(c)(2) prohibit the "acquisition, possession, cultivation, use, distribution, or transportation of marijuana" in specified locations, such as in moving vehicles, school grounds, public parks, and other places open to the public. As the majority notes, the prohibition against the transportation of medical marijuana in places open to the public provides no realistic means for a qualifying patient to obtain his or her initial supply of marijuana for cultivation. *See* Majority opinion at 617–18. Accordingly, construing the chapter to prohibit transportation through public places for the purpose of obtaining an initial supply of medical marijuana would render the statute meaningless. Therefore, I agree with the majority that the statutes cannot be interpreted to criminalize the transportation of medical marijuana in places open to the pub-lic for this purpose. Majority opinion at 617–19.

Respectfully, however, nothing in the statute or legislative history supports the majority's extension of this analysis to transportation of medical marijuana in other places open to the public for any other purpose. HRS § 329–122(c)(2)(E) <u>expressly prohibits</u> "medical use," which includes "transportation" of medical marijuana, through "[o]ther place[s] open to the public." Unlike a prohibition that would prevent a qualifying patient from obtaining an initial supply of marijuana, there is no absurdity in construing this provision as prohibiting transportation for other purposes.

Moreover, the legislative history indicates that the legislature intended to restrict the smoking of medical marijuana to within a qualifying patient's home. The legislature stated:

> [T]he purpose of this Act is to ensure that <u>seriously ill</u> people are not penalized by the State for the use of marijuana for strictly medical purposes when the patient's treating physician provides a professional opinion that the benefits of medical use of marijuana would likely outweigh the health risks for the qualifying patient.

2000 Haw. Sess. Laws Act 228, § 1 at 596 (emphasis added).

However, at least one legislator recognized that the law would prohibit medical marijuana use by at least some "seriously ill" patients. Specifically, Representative Lee pointed out, "[T]his bill has inadvertently left out access to marijuana for the sickest and most needy terminal patients. Many terminally ill patients spend their last days <u>in hospice or receiving hospital care. Marijuana would not be allowed in public places such as these.</u>" 2000 House Journal, at 581 (Statement of Rep. Lee) (emphases added). Senator Chun Oakland, who introduced the measure, also recognized the limitations on the locations for medical use, stating

> This measure is narrowly drawn and would only permit patients who meet very specific medical criteria to use marijuana. A physician must provide the patient with written certification, and the doctor must

have a bona fide relationship with the patient. All other laws against cannabis remain in place. Any diversion would be punished and smoking outside of one's home would not be permitted.

2000 Senate Journal, at 553 (Statement of Sen. Chun Oakland) (emphasis added).

These statements reflect that, although the legislature intended to allow "seriously ill" individuals to legally use medical marijuana, it also intended to impose substantial restrictions on that use. Thus, it is not absurd for the legislature to generally prohibit the transportation of medical marijuana in places open to the public.

The legislative history also reflects that, at the time of its passage, this was a controversial proposal that represented a first step toward legalizing some use of marijuana. See 2000 Senate Journal, at 557 (Statement of Senator Chumbly) ("The legalization of medical marijuana is a divisive topic. People of equal intelligence and equal thoughtfulness can have difficulty seeing eye to eye on this issue. The opinions that people have on this issue often seem to be irreconcilable."). Although the proposal passed the legislature in 2000 by a vote of 15 ayes and 10 noes in the State Senate and a vote of 30 ayes and 20 noes in the State House, numerous legislators expressed reservations about the proposal. 2000 Senate Journal, at 561; 2000 House Journal, at 581. For example, Senator Inouye expressed concern with the way in which a qualifying patient would obtain their "adequate supply" of marijuana: "[W]here are the provisions for cultivating, for growing? Where are the plants to come from? Perhaps considering using the airlines to send the plants over from the Big Island or from Kauai or wherever. That's a great concern." 2000 Senate Journal, at 559 (Statement of Sen. Inouye).

Supporters of the proposal indicated that the proposal would provide qualifying patients with an option to alleviate their illness. See 2000 Senate Journal, at 555 (Statement of Sen. Slom) ("Those of us that have lived with, in our families, that pain and suffering, know all too well that we're not talking about simple nausea or backache or headache or upset stomachs or anything else.... What it

does, however, is to allow the use in those certain medical circumstances where everything else including morphine has been tried and does not relieve the pain and suffering."). Other legislators argued that the proposal would ensure legal protection only for those individuals that were eligible under the law. See, e.g., 2000 Senate Journal, at 560 (Statement of Sen. Matsunaga) ("I also heard the concern that individuals who are caught growing marijuana for recreational use will now try to use this bill as an excuse. Let me assure my colleagues that this bill has a number of safeguards to insure that it will not be misused in this manner.").

This history indicates that the legislature balanced conflicting policy considerations in passing the Medical Use of Marijuana law. Respectfully, in re-weighing these considerations and determining that transportation of medical marijuana should be allowed outside the home other than for initial acquisition, the majority engages in policy judgments reserved for the legislature. This court has stated:

We cannot change the language of the statute, supply a want, or enlarge upon it in order to make it suit a certain state of facts. We do not legislate or make laws. Even when the court is convinced in its own mind that the [l]egislature really meant and intended something not expressed by the phraseology of the [a]ct, it has no authority to depart from the plain meaning of the language used.

State v. Klie, 116 Hawai'i 519, 525, 174 P.3d 358, 364 (2007) (citing State v. Sakamoto, 101 Hawai'i 409, 413, 70 P.3d 635, 639 (2003)).

This court's power to construe statutes so as to avoid absurd results is limited in nature. That the legislature failed to adequately provide a mechanism by which a qualifying patient could receive their initial supply of marijuana is an absurdity that this court can address, since failing to do so would completely frustrate the legislature's purpose in enacting the statute. See Morgan v. Planning Dep't, 104 Hawai'i 173, 185, 86 P.3d 982, 994 (2004) ("[A] departure from a literal construction of a statute is justified when such construction would produce an absurd result and ... is clearly inconsistent with the pur-

poses and policies of the act[.]" (citation omitted)). However, determining that a qualifying patient can freely travel and possess marijuana in "[o]ther place[s] open to the public" is contrary to the express statutory mandate, and is not necessary to avoid the frustration of the legislature's purpose. *See id.* ("[T]his court may not reject generally unambiguous language if construction can be legitimately found which will give force to and preserve all the words of the statute.").

Respectfully, the majority makes policy choices regarding which of the provisions of HRS § 329–122(c)(2) to enforce. Again, HRS § 329–121 allows the "acquisition, possession, cultivation, use, distribution, or transportation of marijuana ... to alleviate the symptoms or effects of a qualifying patient's debilitating medical condition." The majority would allow "transportation" and "possession" of medical marijuana in public places, but would appear to preclude the "acquisition, [ ] cultivation, use, [or] distribution" of marijuana in "[o]ther place[s] open to the public[,]" even though those are also "medical use[s]." *See* Majority Opinion at 619 (holding that a defendant proves his or her affirmative defense of medical use if, inter alia, "the marijuana was not being used, ingested or carried in open view at the time it was discovered").

In addition, the majority finds an absurdity in the prohibition against the transportation of marijuana in "[o]ther place[s] open to the public[,]" but would appear to uphold the prohibition against the "medical use" of marijuana in other locations prohibited by HRS § 329–122(c)(2), such as school buses, youth centers, and moving vehicles. Majority Opinion at 619 (holding that a defendant proves his or her affirmative defense of medical use if, inter alia, "the marijuana was found in an 'other place open to the public,' where transportation for medical use might legitimately occur" (emphasis added)). This interpretation of the statute yields arbitrary and inconsistent results. For example, under the majority's interpretation of the statutes, a qualifying patient would be allowed to transport their medical marijuana through an airport, but would appear to be prohibited from then transporting their marijuana in a moving vehicle, such as an airplane. Again, in my view, decisions such as these involve policy considerations best resolved through the legislative process. Here, the legislature balanced these considerations by prohibiting the transportation of medical marijuana in public places, and our sole duty is to give effect to that intent. *See First Insurance*, 126 Hawai'i at 414, 271 P.3d at 1173.

Accordingly, I respectfully dissent.