FOR PUBLICATION IN WEST'S HAWAI'I REPORTS AND PACIFIC REPORTER

Electronically Filed
Intermediate Court of Appeals
CAAP-15-0000923
28-APR-2017
09:21 AM

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I

---o0o---

(FC-A NO. 15-1-0025)
IN THE MATTER OF ADOPTION OF A
MALE CHILD, H.A.,

and

(FC-A NO. 15-1-0016)
IN THE MATTER OF ADOPTION OF A
MALE CHILD, R.A.,

and

(FC-A NO. 15-1-0013)
IN THE MATTER OF THE ADOPTION OF A
MALE CHILD, R.A.,
By K.W. and D.W., husband and wife,

and

(FC-A NO. 15-1-0021)
IN THE MATTER OF THE ADOPTION OF A
MALE CHILD, H.A.,
By K.W. and D.W., husband and wife,

and

(FC-A NO. 15-1-0022)
IN THE MATTER OF THE ADOPTION OF A
MALE CHILD, R.A.,
By P.O., a single person,

and

(FC-A NO. 15-1-0023)
IN THE MATTER OF THE ADOPTION OF A
MALE CHILD, H.A.,
By P.O., a single person

NOS. CAAP-15-0000929, CAAP-15-0000923, CAAP-15-0000924,
CAAP-15-0000925, CAAP-15-0000927, CAAP-15-0000928
(CONSOLIDATED)

APPEAL FROM THE FAMILY COURT OF THE THIRD CIRCUIT

APRIL 28, 2017

NAKAMURA, CHIEF JUDGE, LEONARD AND REIFURTH, JJ.

OPINION OF THE COURT BY LEONARD, J.

This case involves competing petitions for the adoption of two young brothers, R.A. and H.A., who were under permanent custody of the Department of Human Services (**DHS**). Petitioners/ Appellees the Foster Parents, DHS (on behalf of Respondent/ Appellee/Cross-Appellant **Great Aunt**), and Petitioner/Appellant Grandmother, each filed adoption petitions for R.A. and H.A. The Family Court of the Third Circuit (**Family Court**)[1] held a trial on all petitions and, on November 10, 2015, entered Adoption Decrees granting the Foster Parents' petitions to adopt R.A. and H.A. On December 8, 2015, the Family Court entered an order denying DHS's and Grandmother's adoption petitions.

Appellant/Cross-Appellee Guardian ad Litem for R.A. and H.A. (**GAL**) appeals, Grandmother appeals *pro se*, and Great Aunt cross-appeals, from the Family Court's: (1) November 10, 2015

---

[1]     The Honorable Lloyd X. Van De Car presided.

Adoption Decree granting the Foster Parents' petition for adoption of R.A.; (2) November 10, 2015 Findings and Decision of the Court Granting the Foster Parents' Petition for Adoption of R.A.; (3) November 10, 2015 Adoption Decree granting the Foster Parents' petition for adoption of H.A.; (4) November 10, 2015 Findings and Decision of the Court Granting the Foster Parents' Petition for Adoption of H.A.; and (5) December 8, 2015 Order Denying Petitions for Adoption. On March 11, 2016, this court consolidated all six appeals under CAAP-15-0000929.

I.   BACKGROUND

A.   Pre-Trial

R.A. was born in December of 2011. He was removed from his biological parents and placed in foster custody in February of 2013. DHS was involved because of allegations of lack of supervision, threat of neglect, and because R.A. was exposed to and tested positive for marijuana. The GAL was appointed for R.A. on February 19, 2013.

R.A. was placed with C.O., a maternal aunt, from March 28, 2013 to January 31, 2014. R.A. was then placed with the Foster Parents by DHS Child Welfare Services on January 31, 2014, as resource caregivers. On October 9, 2014, DHS wrote a Permanent Plan for R.A. The Foster Parents, Grandmother, and Great Aunt, who lives in Washington state, were all considered as potential permanent placements at that time.

H.A. was born in March of 2015. On March 31, 2015, DHS assumed custody of H.A. On April 8, 2015, the same GAL was appointed to protect the interests of H.A.

3

On June 15, 2015, the Foster Parents filed a Petition for Adoption for R.A.

On June 29, 2015, DHS wrote a Revised Permanent Plan for H.A., in which DHS deemed that Grandmother was "inappropriate" as a permanent placement. DHS reported that Grandmother "has verbalized an interest in completing a guardianship of [R.A.] because she would like to see Father's child returned to him." "Another concern" was her "ability to remain impartial and protective" of the children. Grandmother told DHS that "she is allowing Mother and Father to live rent-free in her home." DHS was concerned that Grandmother was "too vested in her own son's welfare to be completely and fully protective of her grandchild." DHS also noted concerns of Grandmother's "history of drug abuse," although both Grandmother and her partner submitted to and passed random urinalysis testing.

In the same report, DHS stated that as it pertains to the Foster Parents, a "continued concern of possible permanent placement with [the Foster Parents] is whether they would not maintain family connections, other than the maternal aunt, [C.O.], whom they are friends with. It is the belief of the DHS that [the Foster Parents] will not support family connections." DHS stated, *inter alia*, that "the most appropriate permanent placement in the best interest of [H.A.] is one that includes his older brother, [R.A.]. The Maternal Great Aunts . . . are relatives who have historically been very supportive of

maintaining safe connections with both the maternal and paternal families."

The Foster Parents filed, on July 2, 2015, an *ex parte* motion for injunction against R.A.'s change in placement. On July 10, 2015, DHS, the GAL, and the Foster Parents appeared before the Family Court. DHS reported to the Family Court that H.A. was placed in Washington, and DHS wanted to place R.A. in Washington with Great Aunt as well. The Family Court stated that "this child has been there before and not suffered any harm on account of it. So doing it again doesn't seem to be harmful."

It appears that the biological parents' parental rights were terminated with respect to R.A. on July 9, 2015, and H.A. on July 16, 2015, in separate proceedings, and permanent custody of both children was awarded to DHS.

On August 4, 2015, DHS filed petitions for adoption on behalf of Great Aunt for R.A. and H.A. DHS stated that adoption by Great Aunt "will be in the best interests of the child." DHS filed consents to both adoptions, declaring that Great Aunt "is a suitable and legally qualified adoptive parent."

On August 4, 2015, the Foster Parents filed a petition for adoption of H.A. On August 4, 2015, Grandmother filed her petition for adoption of R.A., which included, *inter alia*, that she had one criminal conviction. On August 10, 2015, Grandmother also filed a petition for adoption of H.A.

On August 4, 2015, the Foster Parents, DHS, and the GAL returned to the Family Court, for what appears to be a status

conference or continued hearing on the Foster Parents' request

for an injunction. The court stated:

> I've been talking with the attorneys for some time now, and while this is an important issue, I expressed to them my belief that regardless of how things work out in the adoption, that it's important for me, and I think it's in the best interests of the boys with their life going forward, that they be placed together, and I also believe that, and I'll say it here, I'm going to have to say it again soon in the presence of the paternal grandmother, I don't believe that she is a viable candidate for adoption, but, however, you, as well as the folks on the mainland, are, and I would like to have the opportunity for me to receive information about how both boys are doing if placed with you and how both boys are doing or will continue to do for the next few days placed together in Washington.
> So what the court is going to do is the following . . . . I'm going to order that the guardian ad litem leave here on the 13th and retrieve both boys, and they're to return here by no later than the 15th.

B.    Trial on Adoption

On August 27 and 28, September 29, and October 1, 2015,

the Family Court heard evidence regarding all six adoption

petitions. DHS, Great Aunt, Grandmother, the Foster Parents, and

the GAL appeared.

Foster Parents' expert witness, Karen De Soto (De

Soto), was qualified as an expert in child development attachment

and trauma. De Soto conducted two observation sessions of the

children with the Foster Parents. The first visit was a home

visit that lasted an hour. The second visit occurred at the zoo.

De Soto spent a total of three and a half hours with the

children. She opined that the Foster Parents "were functioning

as kind of a secure base" for R.A. When asked to assess the

level of comfort that R.A. has in the home, De Soto stated that

R.A. "looked to me like he was very much at home." De Soto

testified that R.A. appeared to be securely attached to the

Foster Parents. De Soto testified that she "thought his

attachment to [Foster Mother] looked very secure." De Soto testified that a move away from Hawai'i Island for R.A. would be difficult, but that did not mean that he could not adjust.

Sandra Pickard (**Pickard**) testified, as a witness called by Foster Parents, and was qualified as an expert in child development attachment and trauma. She met R.A. at home on one occasion and "read all of the court reports" and "GAL reports." Pickard testified that the brains of children under four are in a state of rapid development and growth. Pickard testified that the primary attachment relationship is essential to the development of the brain. According to Pickard, a child that has had more than one disruption in their primary attachment will have an accumulation of emotional distress, which could be severe.

Pickard also opined that R.A. has an increased need for stability and that it is not in R.A.'s best interest to be removed from the Foster Parents' home and placed elsewhere. Pickard admitted, however, "I can't directly speak a lot about [R.A.] from my own personal knowledge so I'm going on what I know from the information in the reports and, um, in my one visit[.]" Pickard testified that the reports reflect that R.A. is "a happy well-adjusted child." Pickard further believed that R.A. "right now has established a very, um, positive attachment with the [Foster Parents]."

Several of the Foster Parents' friends testified in support of the Foster Parents. Each testified that R.A. adjusted

well to the Foster Parents and spoke highly of the Foster Parents' parenting skills.

Kristin Omoto (**Omoto**) testified. Omoto is the licensed social worker at DHS's Child Welfare Services (**CWS**) that supervised R.A. during his placement with the Foster Parents. Omoto gave the Foster Parents Grandmother's telephone number and asked them to call and arrange visits. When the Foster Parents later told Omoto they wanted to adopt R.A., there was a concern that if they were to adopt the children that they would not foster relationships with the children's blood relatives.

Foster Mother testified. Foster Mother and Foster Father married in 2001. They could not conceive, so they decided to adopt. They became foster parents and R.A. moved to their home in January 2014. Foster Mother testified that she limited R.A.'s visits with C.O. and her children so R.A. could adjust to the Foster Parents' home. Foster Mother also testified that DHS told her that Grandmother was not to have unsupervised contact with R.A. and that any visits would be at the Foster Parents' discretion. Because DHS was not comfortable with unsupervised visits, Foster Mother felt the same way. The concern was that Grandmother was a "weak link" to her son, R.A.'s biological father. Grandmother was never invited to her home or any family function because Foster Mother had concerns. Foster Mother testified that C.O. also had expressed concerns about how Grandmother would be able to maintain a safe environment for R.A.

Foster Mother testified that she facilitated the visits with Great Aunt, when she came to Hawai'i. Foster Mother

testified that she saw regressions in potty training, disruption of sleep, and that R.A. was more moody after returning from Seattle. Foster Mother also testified that she facilitated Skype calls between R.A. and Great Aunt.

Foster Mother testified that if she were granted adoption of H.A. she would envision H.A. having similar visits with Grandmother that R.A. does. Foster Mother testified that she would want to continue R.A.'s visits with Grandmother if she was granted adoption and that she would expect that Grandmother would have "longer visits" in the future. Foster Mother stated that if she was able to adopt the children, Skyping between R.A. and Great Aunt "certainly would continue as it has" and as the boys got older, "they would be able to stay for longer periods in Seattle."

DHS called Dr. Steven Choy (**Dr. Choy**), a clinical psychologist, to testify as an expert in the fields of child maltreatment, trauma, child trauma, developmental disabilities and attachment. Dr. Choy testified that "attachment is the mechanism which in terms of human beings, and especially in children, develop a dependency in a sense to the person that they have to attach to." Dr. Choy testified that secure attachment is important to brain growth. Dr. Choy testified that having multiple placements puts children at a higher risk for problems, but not necessarily more problems. Dr. Choy testified that a child can have multiple secure attachments.

Dr. Choy testified that from birth to about nine to ten months, a child can easily attach and reattach. From nine months

to about eighteen months it is "a little bit harder to move." From two years old to three years old is "really one of the hard times." Dr. Choy testified that "the studies show that if you move from one primary attachment that was good to another primary attachment that was good, you don't see a whole lot of problems." Dr. Choy testified that a child who is almost four can transition "pretty quickly" to a new environment and that "children that are adopted by kin do have a better chance for family attachment and continuing attachments."

Dr. Choy never met with the children, and the only information he received about the case was information he received from DHS. Dr. Choy was given a copy of Pickard's written testimony dated August 4, 2015. Dr. Choy testified that it usually takes four to five hours to do a sufficiently comprehensive evaluation to give the assessment that Pickard did. Dr. Choy also testified, "I don't know if [Pickard] is trained to do those psychological tests that can help us make those decisions."

Foster Father testified. Foster Father testified that if they were able to adopt, he would envision visitations with Grandmother "[m]ore or less the same as it is now, possibly a little restructuring to where maybe we do a little longer visitation, I don't know, once a month, as opposed to doing two, but we would definitely continue that. We want to continue that relationship." As far as Great Aunt, Foster Father testified that "we definitely would continue the Skype calls" and "we would like to have them go back and, of course, stay in Seattle for a

short time." Foster Father stated that "we would continue a relationship with" R.A.'s family in Hawai'i.

Foster Father also testified that he has a medical marijuana permit that he obtained shortly after moving to Arizona, five years ago. He testified that he uses marijuana to address chronic knee pain, which is due to playing lacrosse in high school and being a chef for over twenty years; Foster Father stated that he wore away the cartilage in his knees. Foster Father testified that he currently obtains his marijuana through a caregiver. He previously purchased it "through what normal means there were at the time." When asked to clarify what that meant, Foster Father's counsel invoked his Fifth Amendment right against self-incrimination. Foster Father testified that he occasionally smokes marijuana - "[n]ightly or every other night, not always the same." He testified that he does not smoke marijuana around R.A., but smokes it outside after R.A. goes to bed. He testified that he stores his marijuana on the "very top shelf" of his closet, where R.A. does not have access. Foster Father testified that he did not inform DHS of his marijuana permit because he "was never asked."

After two days of trial, on August 28, 2015, the Family Court stated, "We're going to address the issue of where these kids are going to be between now and September 29th." DHS, Great Aunt, and the GAL requested that both children go with Great Aunt. DHS explained that this was the potential permanent placement that they had been working toward. Grandmother requested that H.A. go to Great Aunt, and R.A. stay with the

Foster Parents. The Foster Parents requested that both children stay with them.

The Family Court stated that it would apply the standard of "the best interest of the children" and, as the boys recently returned from the mainland, "another move at this point in time would be disruptive." The Family Court stated that with H.A.'s age, "attachments are easier" and so "remaining here and then traveling again would not present the kind of trouble that it would were he older." "For [R.A.], of course, the testimony is clear that transitions are more difficult at his stage of development. He does seem to be very resilient." The Family Court noted that the children's "closest blood relatives" are located on the island of Hawai'i and ruled that both boys "will remain here in Hawaii in the home of [the Foster Parents] during the recess of these proceedings between now and when these proceedings conclude." The Family Court also ordered that the children remain in the permanent custody of DHS, but be placed pendente lite with the Foster Parents. The Family Court noted, "I haven't heard all of the evidence, but based on the evidence I have heard, I don't have any concerns about the genuineness of the [Foster Parents] in maintaining family connections[.]"

At the resumption of trial on September 29, 2015, Grandmother testified. She testified that she took care of R.A. much of his first year, because of his mother's drug and alcohol issues. Grandmother testified that the Foster Parents have no interest in maintaining family values and connections with the extended family. Grandmother admitted that she was convicted of

growing 876 marijuana plants, and spent three years in prison. However, she had completed a drug treatment program and considered herself to be recovered.

Two of Great Aunt's friends testified in support of Great Aunt and testified that she was great with the boys and that she offered a safe and loving home. Great Aunt testified that she had been to Hawai'i eight times to see R.A. and to work with DHS on permanent placement. R.A. visited Seattle three times, for a total of six weeks, and showed no stress during those visits. H.A. stayed with them for five weeks.

Great Aunt testified that she had Skyped with R.A. since the Foster Parents had him "probably anywhere from one to three times a week." Great Aunt testified regarding a Christmas morning where Foster Mother was not cooperative with Great Aunt's request to Skype with R.A.

The GAL testified. The GAL observed R.A. in the home of all adoption petitioners. The GAL testified that he seemed comfortable in all environments. After discussing with Grandmother that Grandmother was not getting visits with R.A. after R.A. was placed with the Foster Parents, the GAL put it in her report that "those visits needed to happen." The GAL testified that Foster Mother's report that R.A. had problems with potty training came six weeks after R.A. returned from Washington. The GAL recommended that both children be adopted by Great Aunt.

CWS Supervisor Maria Jiminez (Jiminez) testified that:

> The policy regarding placement really involves trying the best that we can to find suitable family members.

13

> That's first and foremost. The other part of that is that the most important thing to the Department is beyond trying to find good family members, we're also trying to do what we think is in the very best interest of the children. So actually what's most important, of course, is what's best for the children, and this is the law that we've been talking about that's changed.
> In this particular case, I think both of those things are very definitely met by placing this baby or these two children with their maternal aunties.
> . . . .
> Sometimes we have to choose what's best, and we would always have to go with what's in the best interests of the children.

Jiminez also testified that R.A. is very well adjusted and seemed to be doing really well with both of his placements, both here and in Washington.

After the close of evidence, the Family Court stated that it needed to "rule on placement of the boys in the interim." The court asked for written closing arguments to be submitted and for suggestions with regard to placement for the two week period before the court's final decision. Grandmother offered to take the children for the two weeks. Both the GAL and counsel for Great Aunt agreed that Grandmother should have children for the two weeks. However, counsel for the Foster Parents objected because "[t]here's been reservations in the past about long-term visits." The Family Court stated to Grandmother:

> I think it's unlikely that I'll grant your adoption petition, not because I don't think - not because I think you're a bad person or anything like that, but that of the contestants, and that's probably the best word I can use, that you offer them the least in terms of a future, and I say that mainly because I - family courts are, I think, by nature, really conservative places, and while you may be a different person than you were at the time of your criminal activity, at the time of your prosecution, at the time of your incarceration, those are things that I cannot ignore, and neither of the other contestants presents that kind of hurdle. It's a hurdle. Frankly, it's there for all of your life, and you know it. So that's my - that's my concern with placement with you.

The Family Court ruled that it would leave the children where they were, with Foster Parents.

C.    The Family Court's Rulings

On October 15, 2015, the Family Court filed a Memorandum Decision, awarding the boys to the Foster Parents. The Family Court wrote, inter alia:

> Justice McKenna wrote in A.S. that DHS' preference was entitled to agency deference, and a party opposing the preference had the burden of establishing that the preference was not in the best interests of the children. The burden of proof, however, is a preponderance of the evidence. So proving that one proposed adoption is in the children's best interests by definition establishes that any other proposed adoption is not. What the A.S. decision makes most clear is that the Family Court must exercise its own judgment concerning what is in the best interests of children involved in custody disputes.

On November 10, 2015, the Family Court filed Findings and Decision of the Court Granting Petition for Adoption, and an Adoption Decree, in FC-A No. 15-1-0013 and FC-A No. 15-1-0021, granting the Foster Parents' petitions as to R.A. and H.A. On November 10, 2015, the Family Court filed its Findings of Fact (FOFs), Conclusions of Law (COLs), which included:

6.    Under HRS § 578-8(c)(1)(H) [sic], DHS' consent is not required if it has been unreasonably withheld.

7.    In a contested adoption, DHS's consent to one petitioner and not another is the legal equivalent of a DHS preference for permanent placement.

8.    Under In the Interest of A.S., 132 Haw. 368 (2014), there is no relative placement preference of foster children; however, that is precisely what DHS has done. DHS has expressed that preference in the guise of its concern that [the Foster Parents] are unlikely to maintain family connections between the boys and the extended families of their biological parents. The Court's review of the record in the FC-S cases and the testimony of [the Foster Parents] convince the Court that DHS ought not to be concerned.

9.    Under In the Interest of A.S., 132 Haw. 368 (2014), the Court must make its own determination which of the competing adoptions is in [R.A.] and [H.A.]'s best interests.

10. Under In the Interest of A.S., 132 Haw. 368 (2014), a party opposing DHS's preference has the burden of establishing, by a preponderance of the evidence, the preference is not in the children's best interests.

11. In any case where there is a dispute as to the custody of a minor child, the Court must consider the best interest factors set forth in HRS § 571-46(b).

12. [quoting all of the HRS § 571-46(b) factors]

13. In this case, parental rights have been terminated, so the factors and references to "parent" in the statute apply here to the three proposed adoptive placements[.]

14. There are no allegations or concerns of sexual or physical abuse, or neglect or emotional abuse by any of the petitioners, so factors one and two do not apply.

15. Factor three, the "overall quality of the parent-child relationship" weighs heavily in favor of placing R.A. with [the Foster Parents]. The testimony of the expert witnesses presented by both DHS and the [Foster Parents], as well as the articles on child development addressing attachment that were admitted in to evidence, establish that at this stage of development children of R.A.'s age are forming attachments critical to healthy growth, and that severing those attachments will create stress.

. . . .

17. [R.A.]'s primary attachments are to [the Foster Parents]. While there is no way to predict how detrimental severing his primary attachments will be for [R.A.], all of the professionals, including the DHS supervisor, agree that there will be a negative impact.

18. As to the other placements, [R.A.] has important relationships with both [Grandmother] and [Great Aunt]; however, they are not primary attachment relationships, and granting adoption to either of them would require severing [R.A.]'s critical attachment to [the Foster Parents].

. . . .

20. Likewise, [Great Aunt] and her partner have a lot to offer [R.A.] and [H.A.], and had [R.A.] been placed with them earlier in his life, formed the attachments with them he has instead formed with [the Foster Parents], this factor may have weighed in their favor, rather than heavily against them.

21. The analysis of the "overall quality of the parent-child relationship" factor for [H.A.] is different. At his stage of development, critical attachments to individuals have not been formed, so moving from one home to another will not have the same negative impact on him that a similar move will have on [R.A.].

22. Factor four, the "history of caregiving or parenting by each parent" again weighs heavily in [the Foster Parent]'s favor. [R.A.] has been with them longer than anyone else, nearly half of his life. During that time he has had the time necessary to interact and form secure attachments. He has spent a few weeks with [Great Aunt], and visits with [Grandmother] regularly, but [the Foster Parents] have been the ones to raise him through his toddlerhood.

23. For [H.A.], he spent three months in a general-licensed foster home, and approximately six weeks with each [Great Aunt] and the [Foster Parents]. He has had visitation with [Grandmother]. However, as discussed above, at his stage of development critical attachments to individuals have not been formed, so this factor is not as important to his analysis as it is to [R.A.]'s.

24. Factor five, a party's "cooperation in developing and implementing a plan to meet the child's ongoing needs, interests, and schedule" weighs equally in favor of all parties. . . .

25. All potential placements are able to meet the physical, emotional, safety, and educational needs of the children. However, the safety factor weighs against [Grandmother] because her criminal history and commitment to her son raise safety concerns. Similarly, this factor weighs against [Great Aunt] because of the potential for divided loyalties between the boys and their mother[].

26. Factor ten, the "child's need for relationships with siblings" is pivotal in this case. It is in [R.A.] and [H.A.]'s best interests to be placed together.

27. Factor eleven, each placement's "actions demonstrating that they allow the child to maintain family connections through family events and activities" weighs only slightly in [Great Aunt] and [Grandmother's] favors. They are blood relation to the boys, and blood relations are generally more likely than non-relatives to maintain family connections. However, as testified to by the Department's expert, if a placement has been supporting family connections before an adoption, they are likely to continue to do so. [The Foster Parents] have been very supportive of [R.A.] and [H.A.]'s connections with his blood relations. They have meaningful ongoing contact with [C.O. and her children]. They have facilitated close to one hundred Skype sessions between [Great Aunt], [Great Aunt's significant other], and [R.A.]. They have photographs of the biological family up in the home. They have also coordinated ongoing, extensive visitation with [Grandmother]. As stated above, the Court's review of the record in the FC-S cases and the testimony of [the Foster Parents] convince the Court that the concerns regarding ongoing family connections are unfounded.

28. As for factor twelve, both [the Foster Parents] and [Great Aunt] have demonstrated an ability to separate the children's needs from their own. This factor

weighs against [Grandmother], who has not maintained good boundaries with her son. She was supporting guardianship over adoption as a permanency goal and continues to make payments on her son's land.

29. Factor thirteen, any "evidence of past or current drug or alcohol abuse by a parent," weighs again against [Grandmother], who carries a federal drug conviction on her record.

30. None of the remaining factors weigh for or against any of the parties.

31. For [R.A.], the overwhelming factor is his need to maintain his connections with [the Foster Parents]. The only result that preserves the critical attachments [R.A.] has made is granting [the Foster Parents'] adoption petitions. For [H.A.], the overwhelming factor is his need to be placed with his brother [R.A.].

32. [The Foster Parents] have proven by preponderance of the evidence that adoption of [H.A.] and [R.A.] by [the Foster Parents] would be in [H.A.] and [R.A.]'s best interests.

33. Thus, the Department has unreasonably withheld its consent to adoption by [the Foster Parents].

On December 8, 2015, the Family Court filed a joint Order Denying Petitions for Adoption in FC-A Nos. 15-1-0016 and 15-1-0025 (Grandmother) and FC-A Nos. 15-1-0022 and 15-1-0023 (Great Aunt).

Grandmother and the GAL appeal the Family Court's rulings, and Great Aunt cross-appeals.

II. POINTS OF ERROR

Great Aunt raises four points of error on appeal:

(1) The Family Court misinterpreted In re AS, applied the wrong standard of review after permanent placement, shifted the burden from the Foster Parents, who challenged the placement, to Great Aunt, and showed no deference to DHS;

(2) The Family Court awarded custody based on a single factor given presumptive paramount weight, creating a priority in adoption cases for the continuity of the primary caretakers;

(3) The Family Court misinterpreted In re AS by finding adoption by kin is not a factor in adoption cases, and falsely accusing DHS of pursuing a relative preference "under the guise" of stating its real concerns about maintaining family connections; and

(4) The Family Court disregarded Foster Father's storage, daily use, and likely illegal purchase of medical marijuana.

The GAL raises three points of error on appeal:

(1) The Family Court erred in temporarily placing the children with Foster Parents on August 4, 2015, and August 28, 2015;

(2) The Family Court erred in granting the adoptions to the Foster Parents; and

(3) The Family Court was clearly erroneous in its FOFs and COLs that the Foster Parents' adoptions were in the best interest of R.A. and H.A.

Grandmother raises the following points of error on appeal:

(1) The Family Court erred when it prejudged her case prior to trial;

(2) The Family Court erred when it ruled against her cases prior to the closing of the trial;

(3) The Family Court erred by not independently drafting its own Findings of Fact;

(4) In re AS does not apply to the instant case;

(5) The Family Court erred when it overlooked conflicting statements from the Foster Parents regarding Foster Father's medical marijuana use;

(6) DHS and the Foster Parents erred in withholding visitations from Grandmother;

(7) The Family Court erred in not admitting Doctor Vigoritto's letter into evidence;

(8) The Foster Parents violated the "Hopes and Dreams" agreement at the Ohana conference;

(9) The Family Court erred in considering Grandmother's prior conviction;

(10) The Family Court wrongly concluded that adoption by the Foster Parents is in the children's best interests; and

(11) The Family Court discriminated against Grandmother because of her age.

III. APPLICABLE STANDARDS OF REVIEW

> Generally, the family court possesses wide discretion in making its decisions and those decision will not be set aside unless there is a manifest abuse of discretion. Thus, we will not disturb the family court's decisions on appeal unless the family court disregarded rules or principles of law or practice to the substantial detriment of a party litigant and its decision clearly exceeded the bounds of reason.

> The family court's FOFs are reviewed on appeal under the "clearly erroneous" standard. A FOF is clearly erroneous when (1) the record lacks substantial evidence to support the finding, or (2) despite substantial evidence in support of the finding, the appellate court is nonetheless left with a definite and firm conviction that a mistake has been made. "Substantial evidence" is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion.

> On the other hand, the family court's COLs are reviewed on appeal de novo, under the right/wrong standard. COLs, consequently, are not binding upon an appellate court and are freely reviewable for their correctness.

> . . . .

>           [T]he family court's determination of what is or is
> not in a child's best interests is reviewed on appeal for
> clear error.
>
>           Moreover, the family court is given much leeway in its
> examination of the reports concerning a child's care,
> custody, and welfare, and its conclusions in this regard, if
> supported by the record and not clearly erroneous, must
> stand on appeal.
>
>           It is well-settled that an appellate court will not
> pass upon issues dependent upon the credibility of witnesses
> and the weight of evidence; this is the province of the
> trier of fact.

In re Doe, 95 Hawai'i 183, 189-90, 20 P.3d 616, 622-23 (2001)

(internal quotation marks, citations, brackets, and ellipses

omitted).

>           "Statutory interpretation is a question of law
> reviewable de novo." State v. Wheeler, 121 Hawai'i 383, 390,
> 219 P.3d 1170, 1177 (2009)(internal quotation marks
> omitted). Our construction of statutes is guided by the
> following rules:
>
>> First the fundamental starting point for
>> statutory-interpretation is the language of the
>> statute itself. Second, where the statutory
>> language is plain and unambiguous, our sole duty
>> is to give effect to its plain and obvious
>> meaning. Third, implicit in the task of
>> statutory construction is our foremost
>> obligation to ascertain and give effect to the
>> intention of the legislature, which is to be
>> obtained primarily from the language contained
>> in the statute itself. Fourth, when there is
>> doubt, doubleness of meaning, or
>> indistinctiveness or uncertainty of an
>> expression used in a statute, an ambiguity
>> exists.

First Ins. Co. of Hawaii v. A&B Props., 126 Hawai'i 406, 414, 271

P.3d 1165, 1173 (2012) (citation omitted).

IV.   DISCUSSION

     A.   Adoption Framework

          Adoption proceedings are governed by Hawaii Revised

Statutes (HRS) chapter 578. HRS § 578-8(a) (2006) provides a

four-part test for entering an adoption decree:

>           § 578-8 **Hearing; investigation; decree.** (a) No
> decree of adoption shall be entered unless a hearing has
> been held at which the petitioner or petitioners, and any

legal parent married to a petitioner, and any subject of the adoption whose consent is required, have personally appeared before the court, unless expressly excused by the court. After considering the petition and such evidence as the petitioners and any other properly interested person may wish to present, the court may enter a decree of adoption if it is satisfied (1) that the individual is adoptable under sections 578-1 and 578-2, (2) that the individual is physically, mentally, and otherwise suitable for adoption by the petitioners, (3) that the petitioners are fit and proper persons and financially able to give the individual a proper home and education, if the individual is a child, and (4) that the adoption will be for the best interests of the individual, which decree shall take effect upon such date as may be fixed therein by the court, such date to be not earlier than the date of the filing of the petition and not later than six months after the date of the entry of the decree.

HRS § 578-1 (Supp. 2016) primarily pertains to who may petition to adopt an individual. HRS § 578-2 (2006 & Supp. 2016) states, in relevant part:

§ 578-2 **Consent to adoption.** (a) Persons required to consent to adoption. Unless consent is not required or is dispensed with under subsection (c) hereof, a petition to adopt a child may be granted only if written consent to the proposed adoption has been executed by:

. . . .

(6) Any person or agency having legal custody of the child or legally empowered to consent;

. . . .

(c) Persons as to whom consent not required or whose consent may be dispensed with by order of the court.
(1) Persons as to whom consent not required:

. . . .

(H) Any legal guardian or legal custodian of the child sought to be adopted, other than a parent, who has failed to respond in writing to a request for consent for a period of sixty days or who, after examination of the person's written reasons for withholding consent, is found by the court to be withholding the person's consent unreasonably;

HRS chapter 578 does not define what constitutes the best interest of the child in the, context of adoption proceedings. However, this case stems from Child Protective Act (HRS chapter 587A) proceedings in which the natural parents'

22

parental rights were terminated and DHS was awarded permanent custody. In such cases (as HRS chapter 587A also does not define the best interest of the child), Hawai'i courts have often looked to applicable best-interest-of-the-child factors provided in HRS chapter 571 for the purpose of determining custody and visitation in divorce proceedings. See, e.g., In re AS, 130 Hawai'i 486, 507, 312 P.3d 1193, 1214 (App. 2013), affirmed and clarified by In re AS, 132 Hawai'i 368, 376-77, 322 P.3d 263, 271-72 (2014). HRS § 571-46(b) (Supp. 2016) states:

> (b) In determining what constitutes the best interest of the child under this section, the court shall consider, but not be limited to, the following:
> (1) Any history of sexual or physical abuse of a child by a parent;
> (2) Any history of neglect or emotional abuse of a child by a parent;
> (3) The overall quality of the parent-child relationship;
> (4) The history of caregiving or parenting by each parent prior and subsequent to a marital or other type of separation;
> (5) Each parent's cooperation in developing and implementing a plan to meet the child's ongoing needs, interests, and schedule; provided that this factor shall not be considered in any case where the court has determined that family violence has been committed by a parent;
> (6) The physical health needs of the child;
> (7) The emotional needs of the child;
> (8) The safety needs of the child;
> (9) The educational needs of the child;
> (10) The child's need for relationships with siblings;
> (11) Each parent's actions demonstrating that they allow the child to maintain family connections through family events and activities; provided that this factor shall not be considered in any case where the court has determined that family violence has been committed by a parent;
> (12) Each parent's actions demonstrating that they separate the child's needs from the parent's needs;
> (13) Any evidence of past or current drug or alcohol abuse by a parent;
> (14) The mental health of each parent;
> (15) The areas and levels of conflict present within the family; and

> (16) A parent's prior wilful misuse of the protection
> from abuse process under chapter 586 to gain a
> tactical advantage in any proceeding involving
> the custody determination of a minor[.]

In addition to these statutory precepts, in In re AS, the supreme court provided clarification and guidance applicable to many of the issues raised in this appeal. The supreme court recognized DHS's expertise, discretion, and statutory charge to make child placement determinations in the first instance, but made clear that the Family Court is required to make its own independent determinations as to the best interest of children in adjudicating permanent placements. In re AS, 132 Hawai'i at 377-78, 322 P.3d at 272-73. In light of DHS's duties and expertise, however, the supreme court held that "where a party challenges DHS's permanent placement determination, that party bears the burden of proving, by a preponderance of the evidence, that the DHS's permanent placement determination is not in the best interests of the child." Id. at 377, 322 P.3d at 272. The supreme court also discussed at some length, and confirmed, that under federal and state law, there is no relative placement mandate or preference with respect to permanent placement matters. Id. at 378-87, 322 P.3d at 273-82. Nevertheless, as emphasized by the concurring justices, kinship is "an anchoring proposition in the sea of circumstances considered in the decision to adopt" and the relevant statutes "do not preclude weighing kinship as a substantial factor in considering with whom

24

a child should be placed under a permanent plan." Id. at 390, 322 P.3d at 85 (referencing HRS § 587A-32).

B.    The Adoption Rulings

In the November 10, 2015 Findings of Fact, Conclusions of Law, the Family Court included 191 numbered paragraphs designated as "Findings of Fact,"[2] the vast majority of which do not properly state findings, because they primarily contain recitals of the various witnesses' testimony with no actual statement of the court's determination as to credibility, weight, or resolution of conflicting evidence. See, e.g., In re Doe, 96 Hawai'i 255, 259, 30 P.3d 269, 273 (App. 2001) ("the family court's statement of the evidence, by itself, is not its finding of fact"); State v. Krstoth, 138 Hawai'i 268, 271 n.2, 378 P.3d 984, 987 n.2 (2016) ("[t]he circuit court actually made few relevant findings, as most of the 'findings' were recitations of testimony"). Nevertheless, the section designated as "Conclusions of Law" contains several paragraphs that are more properly characterized as factual determinations or mixed factual and legal determinations. See, e.g., 9C Charles Alan Wright and Arthur R. Miller, Federal Practice & Procedure Civil § 2579 (3d ed. 2008) ("[a]n appellate court will regard a finding or conclusion for what it is, regardless of the label the trial court may have put on it"). These facilitate our review of the

---

[2]    There are four numbered paragraphs in a section regarding jurisdiction, thirteen in a section regarding case history, and 174 in a section regarding the trial, with each section beginning with the numeral 1.

Family Court's decision to grant the Foster Parents' petitions to adopt and to deny DHS's petitions supporting adoptions by Great Aunt, as well as Grandmother's petitions to adopt R.A. and H.A.

Accordingly, we turn to the HRS § 578-8 requirements for entering the adoption decrees in this case.

1.   Adoptability under HRS §§ 578-1 and 578-2

First, we consider whether R.A. and H.A. are adoptable under HRS §§ 578-1 and 578-2.   There is no dispute concerning the eligibility of each of the adoption petitioners under HRS § 578-1.[3]   With respect to HRS § 578-2, the Family Court's COLs include the following, which are challenged on appeal:

6    Under HRS § 578-8(c)(1)(H) [sic], DHS' consent is not required if it has been unreasonably withheld.

7.   In a contested adoption, DHS' consent to one petitioner and not another is the legal equivalent of a DHS preference for permanent placement.

. . . .

---

[3]    HRS § 578-1 (Supp. 2016) provides:

§578-1 Who may adopt; jurisdiction; venue.  Any proper adult person, not married, or any person married to the legal father or mother of a minor child, or a husband and wife jointly, may petition the family court of the circuit in which the person or persons reside or are in military service or the family court of the circuit in which the individual to be adopted resides or was born or in which a child placing organization approved by the department of human services under the provisions of section 346-17 having legal custody (as defined in section 571-2) of the child is located, for leave to adopt an individual toward whom the person or persons do not sustain the legal relationship of parent and child and for a change of the name of the individual.  When adoption is the goal of a permanent plan recommended by the department of human services and ordered pursuant to section 587A-31, the department may petition for adoption on behalf of the proposed adoptive parents.  The petition shall be in such form and shall include such information and exhibits as may be prescribed by the family court.

> 33.     Thus, the Department has unreasonably withheld its
>         consent to adoption by [the Foster Parents].

It is undisputed that DHS did not consent to Foster Parents' adoption of R.A. and H.A.  Except for what appears to be a typographical error (it should reference HRS § 578-2(c)(1)(H)), COL 6 is generally a correct statement of the law.  COL 7 is not determinative of whether DHS unreasonably withheld its consent to the adoptions by Foster Parents, and we decline to unnecessarily complicate the matter by commenting here on "legal equivalency." COL 33 follows the Family Court's multi-pronged analysis of the considerations for determining the best interests of the child. Clearly, the court's determination that consent was unreasonably withheld was conflated with its determination that adoption by the Foster Parents was in the best interest of both R.A. and H.A.

Under HRS § 578-8, satisfaction of the consent statute, HRS § 578-2, and the determination that the adoption is in the best interests of the child are separate requirements.  Some jurisdictions with such requirements have mandated that the unreasonableness of an agency's withholding of consent be judged independently of the best interests of the child analysis, so as not to render the consent requirement superfluous.  See, e.g., In re Adoption of Missy M., 133 P.3d 645, 650 (Alaska 2006).  The Alaska courts go so far as to hold that a "facially reasonable withholding of consent can be overcome only if the prospective adoptive parent can show, by clear and convincing evidence, that it would be clearly detrimental to the child to deny the

adoption." Id. at 654. That analysis, however, is based on a rather stringent deference to agency expertise, which appears to be inconsistent with our State's requirement that family courts make independent determinations in adjudicating permanent placements. Compare In re Adoption of Missy M., 133 P.3d at 651-52, with In re AS, 132 Hawai'i at 377-78, 322 P.3d at 272-73.

Nevertheless, a requirement that the unreasonableness of DHS's withholding of consent be established independently of the best interest of the child analysis, to avoid rendering that part of the statute superfluous, is well-founded. See, e.g., Santiago v. Tanaka, 137 Hawai'i 137, 156, 366 P.3d 612, 631 (2016) ("courts are bound to give effect to all parts of a statute, and no clause, sentence, or word shall be construed as superfluous, void, or insignificant" (citation and internal quotation marks omitted)). We hold that, prospectively, the family courts must make a separate inquiry into whether the applicable HRS § 578-2 consent provision has been satisfied, or whether the first of the four HRS § 578-8(a) requirements has otherwise been met. With respect to the unreasonableness of DHS's withholding of consent to adoption, consistent with the standard applicable to other aspects of permanent placement, we hold that the party challenging DHS's action bears the burden of proving, by a preponderance of the evidence, that the withholding of consent is unreasonable. See In re AS, 132 Hawai'i at 377, 322 P.3d at 272. The reasonableness of DHS's decision should be

28

examined in light of the process undertaken and the reasons
articulated by DHS in support of its decision to withhold
consent. Inevitably, many if not all of DHS's considerations
regarding consent will be germane to the requirement that the
adoption be in the best interest of the child.[4] However, no
decree of adoption may be entered unless all of the HRS § 578-
8(a) requirements have been satisfied.

In this case, although not expressly stated, it appears
that the findings in COLs 8, 15, 17, 18, 22, 25, 27, 28, and 31
underlie the Family Court's conclusion that DHS unreasonably
withheld consent to the adoption of R.A. by the Foster Parents.
It appears that the only findings that support the Family Court's
conclusion that DHS unreasonably withheld consent to the adoption
of H.A. by the Foster Parents are the findings (in COL 26 and 31)
that it is in both boys' best interest to be placed together.
Neither the GAL nor Grandmother specifically challenges the

---

[4]     We note that HRS § 578-2(c)(1)(H) states, in pertinent part, that
consent is not required from DHS if DHS "has failed to **respond in writing** to a
**request for consent** for a period of sixty days or [if], after examination of
[DHS's] **written reasons** for withholding consent, [DHS] is found by the court
to be withholding [DHS's] consent unreasonably[.]" (Emphasis added.) The
record in this case does not appear to include a request from Foster Parents
to DHS for consent to their adoption of R.A. and H.A. Thus, DHS did not
appear to "respond in writing" or provide "written reasons" for withholding
consent, except to the extent one might construe its petitions for adoption by
Great Aunt as its written reasons for not consenting to the Foster Parents'
petition, which one might broadly view as a request for DHS's consent. It
does not appear that any party or the Family Court raised these issues in the
proceedings below, as grounds for granting or denying Foster Parents'
petition. However, in future proceedings, a petitioner (other than DHS) would
be well advised to submit a (written or otherwise verifiable) request for
consent to DHS. In addition, it appears that DHS has a statutory duty to
provide a written response to such a request, in less than sixty days, or DHS
essentially abdicates its duty to either consent or withhold consent to the
adoption. Finally, we note that pursuant to HRS § 578-8(b), under some
circumstances, a family court may waive the requirement for notice to and an
investigation by DHS.

findings and conclusions stated in these COLs, although it appears they challenge their relative weight, as well as the court's resulting decision. DHS declined to take a position or file briefs in this appeal.

Great Aunt challenges all of these COLs, except COL 22 (that R.A. has mostly been in the care of Foster Parents and formed attachments) and COL 28 (that Foster Parents are able to separate the children's needs from their own).[5] We agree with Great Aunt's contention, regarding COL 8, that there is no evidence in the record to support that DHS's concern regarding the Foster Parents' maintenance of family connections was a "guise" for a relative placement preference and we consider that portion of COL to be clearly erroneous. However, COL 8 also states that the Family Court is convinced by the record in the FC-S cases, as well as the Foster Parents' testimony, "that DHS ought not be concerned." Although there was conflicting evidence on this issue, we cannot conclude that the Family Court clearly erred in this regard.

Upon review of the record and the evidence presented at trial, we conclude there is substantial evidence to support the findings in COLs 8 (except as noted), 15, 17, 18, 22, 25, 26, 27, 28, and 31. In sum, the Family Court determined that DHS's

---

[5] The GAL, Great Aunt and Grandmother all point to Foster Father's daily use of medical marijuana as cause to vacate the Family Court's Decision. However, the withholding of DHS's consent was not based on Foster Father's marijuana use, as it appears that consent was effectively withheld prior to the parties learning of this fact.

consent was unreasonably withheld because the court was convinced that the Foster Parents would maintain family connections, R.A.'s attachment to the Foster Parents was critical to his well-being, severing the connection between Foster Parents and R.A. would negatively impact him, the Foster Parents have raised R.A. through toddlerhood, the Foster Parents (as well as the other petitioners) are able to meet the physical, emotional, safety, and educational needs of both children, the Foster Parents are able to separate the childrens' needs from their own, and the adoption of both boys by the Foster Parents will keep them together. A determination of reasonableness, or unreasonableness, is generally a question of fact. Amfac, Inc. v. Waikiki Beachcomber Inv. Co., 74 Haw. 85, 107, 839 P.2d 10, 24 (1992). Here, the Family Court found and concluded that it was unreasonable for DHS to have withheld consent for the Foster Parents' adoption of R.A. and H.A. This ruling was based on DHS's investigation and testimony, as well as the testimony and evidence presented by the Foster Parents. We cannot conclude that the Family Court clearly erred in this determination.

Therefore, the first of the HRS § 578-8(a) requirements, that R.A. and H.A. are adoptable by the Foster Parents, was satisfied.

2. Suitability of the boys for the adoption

The second requirement stated in HRS § 578-8(a) is "that the individual is physically, mentally, and otherwise

31

suitable for adoption by the petitioners." Although some of the assertions raised by GAL, Great Aunt, and Grandmother on appeal arguably pertain to this requirement, none of the appellants specifically contend that infirmities with respect to this prong of the four-part test warrant vacating the Family Court's decision and orders. Thus, any challenge based on suitability per se is waived and, to the extent applicable, we will address these issues in conjunction with the best interests of the children analysis.

3. <u>Fit and proper petitioners</u>

The third requirement stated in HRS § 578-8(a) is "that the petitioners are fit and proper persons and financially able to give the individual a proper home and education, if the individual is a child." Pertinent to this requirement, in COL 25, the Family Court found that all petitioners were "able to meet the physical, emotional, safety, and educational needs of the children." On appeal, no one directly argues that the Foster Parents are not fit and proper persons with the financial ability to give R.A. and H.A. a proper home and education.

However, Great Aunt and Grandmother argue that the Family Court did not adequately weigh Foster Father's daily use of medical marijuana outside of the family home for chronic knee pain. More pointedly, Great Aunt argues that the court "could certainly consider . . . whether a lifetime use of medical marijuana outside the family home 'endangers the health and well-

32

being' of two little boys removed from their parents' home because of drug abuse." Great Aunt cites HRS § 571-46(b)(13), which requires consideration of "[a]ny evidence of past or current drug or alcohol abuse by a parent."

There was testimony, and the Family Court found, that Foster Father had a medical marijuana permit. There is no evidence of "drug abuse" or that Father used marijuana recreationally, as opposed to medicinally. The Family Court was free to disregard any negative inferences from Father's "taking the Fifth Amendment" when asked how he obtained marijuana prior to having a caregiver. The Hawai'i Supreme Court has acknowledged the lack of clarity that has existed in our medical marijuana statutes and we decline to overturn the Family Court's adoption decision, and its weighing of the evidence, based on Foster Father's decision not to wade into a murky area of potential penal liability. See, e.g., State v. Woodhall, 129 Hawai'i 397, 409, 301 P.3d 607, 619 (2013). The only evidence concerning Foster Father's use of marijuana reflected considered efforts to safely store and use it, away from the boys' access. On the record in this case, we cannot conclude that, because of Foster Father's use of medical marijuana, the Family Court erred in finding and concluding that Foster Parents were fit and proper persons, within the meaning of HRS § 578-8(a).

In addition to the above, the GAL expressed deep concerns about whether the Foster Parents would truly work to

maintain strong family connections with their extended biological relatives who love them and want to support them. The GAL cites many instances and parts of Foster Mother's testimony to support the GAL's concerns. However, these issues were well developed at trial, and there were cogent reasons for, for example, Foster Parents' initial refusal to allow visitation with Grandmother, as DHS had expressed concerns about Grandmother's ability to place the children's needs above those of their parents. The Family Court clearly weighed the evidence and discounted these concerns. On the record in this case, we cannot conclude that, because of the concerns that Foster Parents may not adequately support the boys relationships with their family, the Family Court erred in tacitly finding and concluding that Foster Parents were fit and proper persons, within the meaning of HRS § 578-8(a).

### 4. Best interests of the child

The final requirement in HRS § 578-8(a) is "that the adoption will be for the best interests of the individual." This issue was and remains foremost in the minds of all of the parties and is of utmost concern to both the Family Court and the appellate court.

The GAL contends that the Family Court erred in awarding the adoptions to the Foster Parents against the recommendations of DHS and the GAL. The GAL submits that the Family Court relied too heavily on a single factor, i.e., that R.A. had spent nearly half of his young life in the Foster

Parents' care.  The GAL argues that the Family Court ignored or overlooked many of the factors she used in formulating her placement recommendation including, but not limited to, her concern that the Foster Parents' quest to adopt H.A. was simply a means to ensure that they could keep R.A., and that they did not show adequate interest in or concern for the younger boy. Additional "negatives" include Foster Father's marijuana use and the strong reasons and rationale for adoption by Great Aunt.

Great Aunt expresses these same concerns, and points to problematic areas of testimony and evidence, such as the alleged inadequacy of the time Foster Parents' expert witnesses spent with R.A. before formulating opinions concerning the level of stress and trauma that would be experienced if R.A. would be removed from the Foster Parents' home.  Great Aunt argues that the Family Court misinterpreted In re AS by finding that adoption by kin is not a factor in adoption cases, but acknowledges the Family Court did in fact note that blood relatives are more likely to maintain family connections and specifically considered family connections as a factor.

Grandmother's arguments demonstrate her great love for these children and her desire to be close to them and see them raised with the benefits of strong family ties and knowing their family's religion, values, and traditions.  Grandmother argues that the Foster Parents worked to undermine the possibility of either Grandmother or Great Aunt ultimately being awarded

adoption because their intent was always to try to win adoption of R.A., and then H.A.

It appears, however, that all of the arguments raised on appeal concerning the best interests of R.A. and H.A. were carefully considered by the Family Court. Contrary to Great Aunt's contention, the Family Court did not make its decision based on a single factor or disregard Great Aunt's kinship with the boys in its determination that it would be in their best interest to be adopted by the Foster Parents. The Family Court considered and weighed each of the best interests factors in HRS § 571-46(b), as detailed in COLs 13 through 32, which are set forth above.

Although conflicting testimony and evidence was presented as to some of these factors, there is substantial evidence in the record to support the Family Court's findings, and there is no clear error in the Family Court's determination of what is in the best interests of R.A. and H.A. Accordingly, we will not disturb the Family Court's decision that the Foster Parents' adoption of R.A. and H.A. is in their best interests.

C.   Other Issues Raised on Appeal

1.   The Family Court's application of In re AS

Great Aunt argues that the Family Court misinterpreted In re AS, applied the wrong "standard of review" after permanent placement, shifted the burden from the petitioners who challenged DHS's placement, i.e., the Foster Parents, to Great Aunt, and

showed no deference to DHS. We acknowledge that the lack of differentiation between the best interests of the child analysis and the other statutory requirements set forth in HRS chapter 578 is problematic. Hence, we have held that, prospectively, the family courts must make a separate inquiry into whether the applicable HRS § 578-2 consent provision has been satisfied, or whether the first of the four HRS § 578-8(a) requirements has otherwise been met, and we have confirmed the burden of proof applicable to the determination concerning whether DHS has unreasonably withheld consent. Although the issue is not squarely before us, we have also urged potential adoptive parents and DHS to be more attentive to the process intended to occur pursuant to HRS § 578-2(c)(1)(H) (the provision concerning DHS consent). Again, although not raised here, prudence dictates that separate inquiries be made into each of the other HRS § 578-8(a) requirements, as well.

However, there is sufficient clarity and support in the record of this case to dissuade this court from disturbing the Family Court's decision to grant the Foster Parents' petitions to adopt R.A. and H.A., in part because we reject most aspects of Great Aunt's argument that the Family Court's procedures and analysis are too flawed to stand. Notwithstanding erroneous arguments below by the Foster Parents, in COLs 9 and 10, the Family Court correctly ruled that, under In re AS, it "must make its own determination of which of the competing adoptions is in

[the children's] best interests" and that "a party opposing DHS's preference has the burden of establishing, by a preponderance of the evidence, that the preference is not in the children's best interests." See In re AS, 132 Hawai'i at 377-78, 322 P.3d at 272-73. We cannot conclude that the Family Court acted inconsistently with these standards.

2. The temporary placement in August 2015

The GAL argues that the Family Court erred when, pending completion of the adoption trial, it ordered both boys back from Great Aunt's home in Washington and, effectively ordered that they remain in the Foster Parents' home until a final adoption decision was made. It appears, however, that the Family Court properly exercised its authority, ordering that the children remain in the permanent custody of DHS, but that they be placed pendente lite with the Foster Parents through the trial.

3. Whether the Family Court prejudged Grandmother's petitions for adoption

Grandmother contends that the Family Court erred by prejudging her case prior to trial and declining her petitions for adoption prior to the end of trial. Here, after all of the petitions were filed, but before the evidence was taken at trial, at a hearing on a preliminary matter, which Grandmother did not attend, the Family Court commented that, "I don't believe that she is a viable candidate for adoption, but, however, you [the Foster Parents], as well as the folks on the mainland, are[.]" While it could have been more clearly expressed, it is clear,

38

based on the record as a whole, that the Family Court was not prejudging the case, rather it was stating its initial inclination based on, *inter alia*, DHS's statement of position in the Permanent Plan for H.A., which stated that Grandmother was "inappropriate" as a permanent placement, and cited concerns about her ability to remain impartial and protective of the children, and her history of drug abuse, which include a felony conviction.

### 4. Grandmother's other arguments on appeal

Grandmother also argues that the Family Court erred in not drafting its own FOFs, with respect to DHS and the Foster Parents withholding of visitations from Grandmother, in not admitting Doctor Vigoritto's letter into evidence, in considering Grandmother's prior conviction, and in discriminating against her because of her age. Upon careful review, we conclude that these arguments are without merit.

Hawaii Family Court Rule 110, which applies to adoption proceedings, provides, in relevant part: "Notwithstanding Rule 52 of these rules, following the hearing, written findings of fact and conclusions of law that shall be prepared by the court or by the attorney for the petitioner or petitioners shall be entered in each case." Therefore, the Family Court was not required to independently draft its own FOFs and COLs.

39

Any possible error by DHS in imposing or suggesting restrictions on Grandmother's visitation with R.A. does not show that the Family Court abused its discretion or otherwise erred.

At trial, Grandmother attempted to admit into evidence her exhibit A-14, a letter from psychologist Dr. Vigorito. Counsel for the Foster Parents objected for lack of foundation and hearsay. The Family Court sustained the objection and explained the hearsay rule and necessity of a hearsay exception to admit the letter. Grandmother stated that CWS requested Grandmother and her partner to undergo a psychological evaluation to "claim that we are a safe environment to raise our grandchildren." Grandmother's proffer was insufficient to establish a hearsay exception. Arguments that were not presented to the Family Court are considered waived. <u>See</u>, <u>e.g.</u>, <u>Hong v. Kong</u>, 5 Haw. App. 174, 177, 683 P.2d 833, 837 (1984).

Grandmother notes that she has been sober for fourteen years, which is commendable. Under HRS § 571-46(b)(13), however, the Family Court was required to consider any evidence of past drug abuse by Grandmother. The Family Court found that this factor weighed against her because of her federal drug conviction. As substantial evidence supports this finding, the Family Court did not clearly err. <u>See</u> <u>In re Doe</u>, 95 Hawai'i at 190, 20 P.3d at 623.

Finally, in applying the best interests standards, the Family Court did not refer to Grandmother's age and, although the

Family Court previously noted her age and her anticipated age at the time H.A. reached eighteen years old, there is no indication in the record that the court inappropriately weighed Grandmother's age in declining to award adoption to her.

V.    CONCLUSION

For these reasons, we affirm the Family Court's November 10, 2015 Adoption Decrees granting the Foster Parents' petitions to adopt R.A. and H.A., as well as the Family Court's December 8, 2015 order denying DHS's and Grandmother's adoption petitions.

On the briefs:

Peter Van Name Esser,
for Respondent/Appellee/
 Cross-Appellant P.O.

L.A.,
Petitioner/Appellant *pro se*.

Stephanie St. John,
Appellant Guardian Ad Litem.

Francis T. O'Brien,
for Petitioners/Appellees
 D.W. and K.W.